[No. 84716-9.   En Banc.]

Argued June 28, 2011.     Decided February 9, 2012.

THE STATE OF WASHINGTON, *Petitioner*, v. LESTER RAY JIM, *Respondent*.

*Robert M. McKenna, Attorney General,* and *Michael S. Grossmann* and *Joseph V. Panesko, Assistants,* for petitioner.

*Thomas A. Zeilman* (of *Law Offices of Thomas Zeilman*), for respondent.

*Matthew B. Leonhard* on behalf of Confederated Tribes of the Umatilla Indian Reservation, amicus curiae.

*John W. Ogan* on behalf of Confederated Tribes of the Warm Springs Reservation of Oregon, amicus curiae.

*Julie S. Kane* and *David J. Cummings* on behalf of Nez Perce Tribe, amicus curiae.

*Julio V.A. Carranza* on behalf of Confederated Tribes and Bands of the Yakama Nation, amicus curiae.

¶1 Owens, J. — Lester Ray Jim, an enrolled member of the Yakama Nation, was cited by the State for unlawfully retaining undersized sturgeon. This occurred at the Maryhill Treaty Fishing Access Site (Maryhill), a plot of land set aside by Congress exclusively for the use of four Columbia River tribes to exercise their treaty fishing rights. The State argues it has rightfully assumed criminal jurisdiction at Maryhill. We disagree. We hold that Maryhill is reserved and held by the United States for the exclusive use of tribal members and that the State therefore lacks criminal jurisdiction.

## FACTS

¶2 The basic facts of this case are undisputed. On June 25, 2008, Jim incidentally caught five undersized sturgeon in his gill net when fishing commercially, under right of treaty, in the Columbia River. Jim took the undersized sturgeon ashore at Maryhill. There, officers from the Washington State Department of Fish and Wildlife issued a citation to Jim for unlawful use of a net and unlawfully retaining the undersized sturgeon, citing RCW 77.15-.580(1)(b) and former WAC 220-32-05100W (Wash. St. Reg. 08-14-029 (June 21, 2008)), *repealed by* Wash. St. Reg. 08-14-091 (July 1, 2008).[1]

---

[1] The cited WAC was an emergency rule, which has since been repeatedly revised by the Department of Fish and Wildlife. *See* Wash. St. Reg. 08-14-091

¶3  Jim describes it as the usual practice among Yakama fishers to wait until coming ashore to release sturgeon. He contends that he told the Department of Fish and Wildlife officers that he planned to release the sturgeon, which can survive out of water for several hours, and that the officers in fact released the live fish back into the river. While both state and tribal law restrict the retention of undersized sturgeon, only state statute makes it unlawful to "[f]ail[ ] to return unauthorized fish to the water *immediately*." RCW 77.15.580(1)(b) (emphasis added). Tribal law allows "[a]ll Yakama members . . . a *reasonable opportunity* to release alive any sturgeon of prohibited length incidentally caught in authorized fisheries." REVISED LAW & ORDER CODES OF YAKAMA NATION § 32.18.07(D) (emphasis added); Clerk's Papers (CP) at 21.

¶4  This incident occurred at Maryhill. Maryhill is one of several treaty fishing access sites established by Congress in 1988. Indian Reorganization Act amendments, Pub. L. No. 100-581, § 401, 102 Stat. 2938 (1988). These treaty fishing access sites were created by Congress in response to the devastation of many accustomed fishing grounds of Columbia River tribes that were flooded when the Bonneville Dam was built. S. REP. NO. 100-577, at 43 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3908, 3933.

■  ¶5  By way of background, by treaty in 1855, the Yakama Nation ceded claim to tens of thousands of acres of land and reserved other land and rights, including "the right of taking fish at all usual and accustomed places." Treaty between the United States and the Yakama Nation of Indians, arts. 1-3, June 9, 1855, 12 Stat. 951, 953. In 1945, in response to the devastation of many of the "usual and accustomed places" for Yakama and other Indian treaty fishing, Congress first created several "in-lieu" fishing sites. River and Harbor Act of 1945, Pub. L. No. 79-14, § 2, 59 Stat. 10, 22 (1945) ("[S]uch lands . . . shall be subject to

("Because conditions change rapidly, the fisheries are managed almost exclusively by emergency rule.").

the same conditions, safeguards, and protections as the treaty fishing grounds submerged or destroyed."); *see State v. Sohappy*, 110 Wn.2d 907, 908-09, 757 P.2d 509 (1988). Then, in 1988, Congress provided for the establishment of at least six additional treaty fishing access sites, as well as the improvement of existing in-lieu sites. Maryhill is one such treaty fishing access site. Congress indicated that these newer treaty fishing access sites were to be created and treated consistently with the existing in-lieu sites and that they were "for the *permanent* use and enjoyment of the Indian tribes." S. REP. No. 100-577, at 31, 43, *reprinted in* 1988 U.S.C.C.A.N. at 3921, 3933 (emphasis added). By law, the land must "be administered to provide access to usual and accustomed fishing areas" for four tribes, including "the Confederated Tribes and Bands of the Yakima Indian Nation." § 401(a), 102 Stat. at 2944. Federal regulations make clear that the right of use is reserved *exclusively* for the named tribes. 25 C.F.R. §§ 247.2(b), .3.

¶6 Jim challenged the State's jurisdiction to prosecute him for an alleged criminal violation at Maryhill. Specifically, Jim filed a motion in the Klickitat County District Court to dismiss this case because the State lacks jurisdiction to regulate or prosecute him under RCW 77.15.580. On October 21, 2008, the district court granted Jim's motion. The State appealed to the Klickitat County Superior Court. In a written opinion dated April 1, 2009, relying on *State v. Cooper*, 130 Wn.2d 770, 928 P.2d 406 (1996), the superior court concluded that the State has jurisdiction because "[t]he Maryhill Treaty Fishing Access Site is not within the boundary of the Yakama reservation." CP at 51.

¶7 Jim, in turn, appealed. The Court of Appeals reversed the superior court, reinstating the district court's order of dismissal. *State v. Jim*, 156 Wn. App. 39, 44, 230 P.3d 1080 (2010). The Court of Appeals relied on *State v. Sohappy*, which "was limited to a particular in-lieu fishing site." *Jim*, 156 Wn. App. at 42. However, it reasoned that "[w]hile *State v. Sohappy* merits a narrow construction, . . . that court did not

intend no other treaty site could ever be exempt from State criminal jurisdiction." *Id.* at 43. The Court of Appeals concluded that Jim's case is factually similar to the facts in *State v. Sohappy* and, accordingly, that the State does not have criminal jurisdiction at Maryhill. *Jim*, 156 Wn. App. at 43.

¶8 The State again appealed, and this court accepted discretionary review. *State v. Jim*, 170 Wn.2d 1001, 245 P.3d 226 (2010).

## ISSUE

¶9 Does the State have criminal jurisdiction to cite an enrolled member of the Yakama Nation at Maryhill?

## ANALYSIS

*Standard of Review*

¶10 Where there is no factual dispute as to the location of the alleged crime, the question of the State's jurisdiction is a question of law. *State v. L.J.M.*, 129 Wn.2d 386, 396, 918 P.2d 898 (1996). This court reviews questions of law de novo. *State v. Squally*, 132 Wn.2d 333, 340, 937 P.2d 1069 (1997).

*Public Law 280 and State Jurisdiction*

¶11 Washington State's jurisdiction over Indian country is limited. Indian country is defined by federal law to mean

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

(b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

(c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.

¶12 Through Public Law 280, Congress gave leeway to states, except those it required, to assume jurisdiction over Indian country. Pub. L. No. 83-280, 67 Stat. 588 (1953) (codified as amended at 18 U.S.C. § 1162; 25 U.S.C. §§ 1321, 1323, 1324); *see Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 471-74, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979) (*Yakima Indian Nation*). Public Law 280 was later amended by Congress to require tribal consent to state jurisdiction in Indian country. *See* 25 U.S.C. §§ 1321, 1323. However, before then, Washington State assumed some criminal and civil jurisdiction over Indian country. Laws of 1957, ch. 240, § 1, *amended by* Laws of 1963, ch. 36, § 1; *see Yakima Indian Nation*, 439 U.S. at 499, 502 (holding that RCW 37.12.010 complies with Public Law 280 and is constitutional). This case concerns Washington's assumption of criminal jurisdiction.

■■ ¶13 State jurisdiction over Indian country is codified at RCW 37.12.010. The statute provides that Washington assumes criminal jurisdiction

over Indians and Indian territory, reservations, country, and lands . . . , but such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States.

RCW 37.12.010. State jurisdiction is further limited by a provision that provides, among other things, that nothing in chapter 37.12 RCW shall deprive any Indian or tribe of a treaty fishing right.[2] RCW 37.12.060. While a tribe can consent to greater state jurisdiction, *see* RCW 37.12.021,

---

[2] Jim alternatively argues that the State does not have jurisdiction to enforce RCW 77.15.580(1)(b) because it interferes with his exercise of his treaty fishing

the Yakama Nation has never given its consent and is therefore subject only to the nonconsensual jurisdiction asserted by the State in RCW 37.12.010. *Yakima Indian Nation*, 439 U.S. at 465-66. In sum, under RCW 37.12.010, the State does not have criminal jurisdiction over Yakama Indians on tribal lands that are within an established reservation and held in trust or subject to a restriction on alienation by the United States.[3]

*State Criminal Jurisdiction at Maryhill*

¶14 The State lacks criminal jurisdiction at Maryhill because the treaty fishing access site is tribal land, established and reserved by Congress for the exclusive use of tribal members. The State does not dispute that the site is tribal land. Rather, this case turns most prominently on whether Maryhill is an established reservation. Accordingly, because we find that Maryhill is an established reservation held in trust by the United States for the benefit of tribes, we hold that RCW 37.12.010 precludes state criminal jurisdiction.

¶15 " 'The term "Indian reservation" is not defined by statute.' " *State v. Sohappy*, 110 Wn.2d at 910 (quoting *United States v. Sohappy*, 770 F.2d 816, 822 (9th Cir. 1985)). While the treaty between the federal government and the Yakama Nation reserves and defines the boundaries of one

---

rights. However, this is an issue for trial, not a question of jurisdiction. *State v. Reed*, 92 Wn.2d 271, 275, 595 P.2d 916 (1979); *State v. Petit*, 88 Wn.2d 267, 269-70, 558 P.2d 796 (1977).

[3] The parties argue this case based on reading RCW 37.12.010 to limit state jurisdiction only within a reservation on lands held in trust or subject to a restriction on alienation. Another potentially legitimate, plain reading of the text is to separate the sentence earlier so that "within an established Indian reservation" modifies only "allotted lands." RCW 37.12.010. Under that reading, the State does not have jurisdiction over "Indians when on their tribal lands." *Id.* Nor does it have jurisdiction on "allotted lands within an established Indian reservation." *Id.* The statute does not define "tribal lands" but, given again that Maryhill is held for the exclusive use of tribes to exercise their treaty fishing rights, it plainly seems to be tribal land. Because we find that the State does not have jurisdiction even under the interpretation of the statute that gives the State the broadest jurisdiction, we need not reach this question of an alternative statutory interpretation.

large tract of land, there is no indication in the law that "reservation" means only a specific tribe's original treaty reservation. The State jurisdictional statute does not specify how or when the reservation of land must be established.

¶16 A plain reading of the statute and consideration of the character of the land indicates that Maryhill is a reservation. The site was reserved by Congress for the exclusive and *"permanent* use and enjoyment of the Indian tribes." S. REP. No. 100-577, at 43, *reprinted in* 1988 U.S.C.C.A.N. at 3933 (emphasis added); *see* 25 C.F.R. §§ 247.2(b), .3. While more than a century after the treaty with the Yakama Nation, Congress clearly established Maryhill and reserved it for tribal use. Dictionary definitions offer a broad conception of the term "reservation." BLACK'S LAW DICTIONARY 1422 (9th ed. 2009) ("[a] tract of public land that is not open to settlers but is set aside for a special purpose; esp., a tract of land set aside for use by indigenous peoples"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1930 (2002) ("a tract of public land set aside for a particular purpose (as schools, forest, or the use of Indians)"). So, while Maryhill is not *the* Yakama Indian Reservation, it is nonetheless an area of land reserved for the exclusive use of four named tribes, making it *an* Indian reservation.

¶17 Federal law also strongly informs our conclusion that Maryhill is an established reservation for purposes of determining state jurisdiction. The federal definition of "Indian country" and the land on which the State has assumed criminal jurisdiction do not exactly align. *Compare* 18 U.S.C. § 1151, *with* RCW 37.12.010. So whether land is Indian country for purposes of federal jurisdiction is not itself dispositive of whether the same land is within an Indian reservation for purposes of state criminal jurisdiction. However, the term "Indian reservation" appears in the federal definition of Indian country as one of three categories of land of which Indian country is comprised. 18 U.S.C.

§ 1151(a). If a tract of land is considered Indian country *because* it is a reservation, *see id.*, this informs whether such land is also a reservation for purposes of State jurisdiction under RCW 37.12.010. The term "reservation" is not defined in federal statute, though federal courts have had an opportunity to consider the matter. Because the very authority of Washington's statutory assumption of state criminal jurisdiction over Indian lands derives from federal law, *see* 25 U.S.C. §§ 1321, 1323, the two schemes are necessarily related.

¶18 In *United States v. Sohappy*, the Ninth Circuit held that Cooks Landing, an in-lieu fishing site, "amount[s] to 'reservation land'" within the federal statutory definition of Indian country. 770 F.2d at 823. Cooks Landing is an in-lieu fishing site that was established for the use and benefit of several Columbia River tribes with treaty fishing rights at usual and accustomed locations that were devastated by flooding caused by the Bonneville Dam. *See State v. Sohappy*, 110 Wn.2d at 908-09. The Ninth Circuit *Sohappy* case involved a question of federal jurisdiction to prosecute several Indian defendants for catching and selling fish "outside the seasons prescribed by Indian tribal and state law" under the federal Lacey Act Amendment of 1981, 16 U.S.C. § 3372.[4] 770 F.2d at 817. The Ninth Circuit had to decide whether Cooks Landing was within Indian country to determine whether a necessary element of the crime was proved. *Id.* at 822. The Ninth Circuit determined that the in-lieu site was a reservation, and thus Indian country, based on language from two United States Su-

---

[4] The State argues that failure to recognize state criminal jurisdiction will result in Maryhill being void of jurisdiction. While this is not a basis for state jurisdiction, we note that the concern is also overstated. Here, for example, it is notable that the Lacey Act Amendment of 1981 provides federal jurisdiction to prosecute certain violations of tribal and state law related to wildlife in Indian country. 16 U.S.C. § 3372(a). There is federal jurisdiction over major crimes. 18 U.S.C. § 1153. There is also tribal jurisdiction at Maryhill. *See United States v. Lara*, 541 U.S. 193, 210, 124 S. Ct. 1628, 158 L. Ed. 2d 420 (2004); *Settler v. Lameer*, 507 F.2d 231, 237 (9th Cir. 1974). And the State has full jurisdiction where non-Indians are involved. *Yakima Indian Nation*, 439 U.S. at 498.

preme Court cases discussing the meaning of "reservation." *Id.* at 822-23 (citing *United States v. John*, 437 U.S. 634, 649, 98 S. Ct. 2541, 57 L. Ed. 2d 489 (1978); *United States v. Pelican*, 232 U.S. 442, 449, 34 S. Ct. 396, 58 L. Ed. 676 (1914)).

¶19 In *John*, the United States Supreme Court considered whether the Indian Major Crimes Act, 18 U.S.C. § 1153, gave the federal government *exclusive* jurisdiction over an assault that occurred "on lands within the area designated as a reservation for the Choctaw Indians residing in central Mississippi." 437 U.S. at 635. The Supreme Court held that the land in question was part of Indian country and that the federal government therefore had exclusive jurisdiction over the assault, while the state had none. *Id.* at 647-49. The Court specifically considered whether the land was an Indian reservation, the first category of Indian country land. *Id.* at 648 (citing 18 U.S.C. § 1151). The Court described "[t]he principal test" as "whether the land in question 'had been validly set apart for the use of the Indians as such, under the superintendence of the Government.' " *Id.* at 648-49 (quoting *Pelican*, 232 U.S. at 449). The *John* Court made this additional persuasive observation:

> The Mississippi lands in question here were declared by Congress to be held in trust by the Federal Government for the benefit of the Mississippi Choctaw Indians who were at that time under federal supervision. There is no apparent reason why these lands, which had been purchased in previous years for the aid of those Indians, did not become a "reservation," at least for the purposes of federal criminal jurisdiction at that particular time. But if there were any doubt . . . , the situation was completely clarified by the proclamation in 1944 of a reservation.

*Id.* at 649 (citation omitted). *John* suggests that the land in question was a reservation as soon as it was set aside for the benefit of the tribe. This is the language that the Ninth Circuit in turn applied to hold that the in-lieu fishing site of

Cooks Landing is a "reservation" for purposes of federal law in *United States v. Sohappy*, 770 F.2d at 822-23.

¶20 In *State v. Sohappy*, this court considered whether the State had criminal jurisdiction at Cooks Landing, the same in-lieu fishing site that the Ninth Circuit held was reservation land for purposes of federal jurisdiction.[5] 110 Wn.2d at 909-11. This court applied the reasoning of the Ninth Circuit that Cooks Landing amounted to a reservation and held that because Cooks Landing is a reservation for purposes of federal law defining Indian country, it is also a reservation for purposes of determining State jurisdiction. *Id.* at 910-11 ("[Cooks Landing] is a part of a reservation for purposes of application of our state jurisdiction statute."). Accordingly, this court unanimously held that the State lacks criminal jurisdiction at the in-lieu fishing site. *Id.* at 911.

¶21 The character of Maryhill is essentially the same as that of Cooks Landing, where this court held that the State did not have criminal jurisdiction. Maryhill was created later for the same purpose of assuring specific tribes could exercise their treaty fishing rights after the devastation of their usual and accustomed fishing sites. S. REP. No. 100-577, at 43-45, *reprinted in* 1988 U.S.C.C.A.N. at 3933-35. Use of in-lieu sites, including Cooks Landing, is restricted to Indians. *State v. Sohappy*, 110 Wn.2d at 908-09 (citing former 25 C.F.R. § 248.2 (1987)). Treaty fishing access sites, including Maryhill, are similarly subject to federal regulation preserving the site for the exclusive use of the beneficiary tribes. *Compare* 25 C.F.R. §§ 247.2(b), .3, *with* 25 C.F.R. § 248.2. Congress recorded its intent that the treaty fishing access sites should be treated consistently with the in-lieu sites. S. REP. No. 100-577, at 31, *reprinted in* 1988 U.S.C.C.A.N. at 3921.

---

[5] State, federal, and tribal jurisdiction can be overlapping so the existence of one is not necessarily determinative of the others. *See State v. Schmuck*, 121 Wn.2d 373, 380, 850 P.2d 1332 (1993).

¶22 In *State v. Sohappy*, we noted that our holding was narrowly limited to the specific in-lieu site based on our reliance upon the *United States v. Sohappy* decision that Cooks Landing is reservation land.[6] 110 Wn.2d at 909-11. However, Maryhill has all the same characteristics of the land in question in *State v. Sohappy*. As the Court of Appeals reasoned in this case, the "[*State v. Sohappy*] court did not intend no other treaty site could ever be exempt from State criminal jurisdiction." *Jim*, 156 Wn. App. at 43. We agree. Because the reasoning in *State v. Sohappy* is sound, we apply it here and conclude that Maryhill is also a reservation.

¶23 The State argues that *Cooper* is controlling in this case. We are not persuaded. In *Cooper*, we again confronted the question of state criminal jurisdiction over Indians. 130 Wn.2d at 772. Specifically, Cooper was convicted of child molestation on property held in trust as an Indian allotment outside the Nooksack Reservation, and this court held that the State had criminal jurisdiction because the land was "outside the boundaries of an established Indian reservation." *Id.* The court distinguished *State v. Sohappy* as "clearly limited to the in-lieu fishing site in question." *Id.* at 778. However, *Cooper* and *State v. Sohappy* are not necessarily conflicting. *Cooper* involved allotment land, which means that it was held in trust for an individual Indian, not a tribe. *Id.* at 772 n.1; *see State v. Comenout*, 173 Wn.2d 235, 267 P.3d 355 (2011). Maryhill is unique from allotment land because it is land that was set aside by Congress for the exclusive use of tribes, not an individual. *See John*, 437 U.S. at 648-49; *United States v. Sohappy*, 770 F.2d at 823.

¶24 In sum, Maryhill would be considered a reservation for purposes of federal jurisdiction. An in-lieu fishing site is a reservation for purposes of federal jurisdiction, *see United States v. Sohappy*, 770 F.2d at 823, and treaty fishing access sites have the same status as the previously

---

[6] The court also alluded to poor briefing by the State but did not limit its holding on that basis. *State v. Sohappy*, 110 Wn.2d at 909.

created in-lieu sites, S. Rep. No. 100-577, at 31, *reprinted in* 1988 U.S.C.C.A.N. at 3921 ("[T]he legal status of the newly provided in-lieu sites will be entirely consistent with those of existing sites."). We interpret the meaning of "reservation" for purposes of state jurisdiction consistently with federal law.

¶25 In addition to the plain meaning of the statute and persuasive federal case law, it is also of note that the Department of the Interior, Bureau of Indian Affairs expressed its agreement that "the States do not have regulatory jurisdiction or authority over the in-lieu fishing sites." Use of Columbia River Treaty Fishing Access Sites, 62 Fed. Reg. 50,866, 50,867 (Sept. 29, 1997) (codified at 25 C.F.R. pt. 247). This does not directly inform the understanding of whether Maryhill is within a reservation for purposes of state jurisdiction, but it provides persuasive authority on the intent to preclude states from exercising broad authority over tribal members at these established fishing sites.

¶26 We also note that Maryhill is different from other usual and accustomed fishing sites because it is reserved exclusively for tribal use and *not* shared in common with other citizens. *Compare* 25 C.F.R. §§ 247.2(b), .3, *with Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 662, 99 S. Ct. 3055, 61 L. Ed. 2d 823 (1979) (discussing a treaty providing for fishing rights " 'in common with all citizens of the Territory' " (quoting 10 Stat. 1133)). There is something fundamentally different about land that is set aside for the exclusive use of tribes and land, which may be privately owned, that is open for shared and equitable use.

¶27 We consider all of this in light also of the canon that treaties and statutes passed for the benefit of Indian tribes are to be liberally construed in favor of tribes with " 'doubtful expressions being resolved in favor of the Indians.' " *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S. Ct. 2102, 48 L. Ed. 2d 710 (1976) (quoting *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 89, 39 S. Ct. 40, 63 L. Ed. 138

(1918)). Under a plain reading of the state jurisdictional statute and consideration of the character of Maryhill, as well as a reading that results in a consistent interpretation of "reservation" in state and federal law, we conclude that Maryhill is an "established reservation."

¶28 Finally, the State argues that even if Maryhill can be considered a reservation, the State nonetheless has jurisdiction because the land is fee land, not trust land, owned by the federal government. *See* RCW 37.12.010 (State criminal jurisdiction does "not apply to Indians when on their tribal lands . . . within an established Indian reservation *and held in trust by the United States or subject to a restriction against alienation imposed by the United States.*" (emphasis added)). However, Maryhill is more like trust land or land with a restriction against alienation than fee land: it is held by the government for the exclusive use and benefit of the tribes and remains as such except by a change in law. § 401, 102 Stat. at 2944; 25 C.F.R. §§ 247.2(b), .3.

¶29 A trust or fiduciary relationship can exist " '(unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.' " *United States v. Mitchell*, 463 U.S. 206, 225, 103 S. Ct. 2961, 77 L. Ed. 2d 580 (1983) (quoting *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980)). In *Mitchell*, the United States Supreme Court held that "[a]ll of the necessary elements of a common-law trust are present" where the federal government managed forest resources on tribal land. *Id.* Similarly, all of the necessary elements of a common law trust are present in this case: a trustee (the United States), a beneficiary (the four Columbia River treaty tribes), and a trust corpus (treaty Indian fishing sites, i.e., "trust property"). Because the necessary elements of a trust exist, we hold that the land is held in trust, even absent that specific designation in the statute providing for the land. *Cf.* 25 U.S.C. §§ 465, 608.

CONCLUSION

¶30 Washington State chose to assume only limited jurisdiction over Indian country under Public Law 280. In so doing, it recognized tribal sovereignty, which includes, to some extent, the right and responsibility to self-police. At Maryhill, a site established by Congress and reserved for the exclusive use of tribes, Indians have "the greatest interest in being free of state police power." *Yakima Indian Nation*, 439 U.S. at 502. Consistent with federal law, the plain reading of the state statute assuming limited jurisdiction in Indian country, RCW 37.12.010, Maryhill is an established reservation held in trust for the tribe. Accordingly, we hold that Maryhill does not fall within the State's assumption of criminal jurisdiction. We affirm the Court of Appeals.

C. JOHNSON, CHAMBERS, FAIRHURST, and STEPHENS, JJ., and ALEXANDER, J. PRO TEM., concur.

¶31 WIGGINS, J. (dissenting) — The majority and the Court of Appeals hold that the State does not have criminal jurisdiction over Indians at the Maryhill Treaty Fishing Access Site (Maryhill). The majority ignores the historical background of Maryhill and the other in-lieu fishing access sites, which demonstrates persuasively that Maryhill is not within an "established Indian reservation." RCW 37.12.010. The majority also relies on our decision in *State v. Sohappy*, 110 Wn.2d 907, 757 P.2d 509 (1988) (*Sohappy* II), to hold that Maryhill is exempt from state criminal jurisdiction because it is a de facto reservation. But *Sohappy* II states that its holding is limited to the site at issue there, Cooks Landing. Moreover, we reached our decision in *Sohappy* II under the misimpression that federal jurisdiction over Cooks Landing preempted state jurisdiction. *Id.* I therefore respectfully dissent.

¶32 At the federal government's invitation, Washington assumed criminal jurisdiction in Indian country in 1963:

The state of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but *such assumption of jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States. . . .*[7]

RCW 37.12.010 (emphasis added).

¶33 Our fundamental purpose in construing statutes is to ascertain and carry out the intent of the legislature. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 229 P.3d 791 (2010). We determine the intent of the legislature primarily from the statutory language. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). If the language of the statute is plain on its face, we give effect to that plain meaning. *TracFone Wireless, Inc. v. Dep't of Revenue*, 170 Wn.2d 273, 281, 242 P.3d 810 (2010). Statutory language is ambiguous only if it can reasonably be interpreted in more than one way. *W. Telepage, Inc. v. City of Tacoma Dep't of Fin.*, 140 Wn.2d 599, 608, 998 P.2d 884 (2000). To discern a plain meaning, we employ traditional rules of grammar. *State v. Bunker*, 169 Wn.2d 571, 578, 238 P.3d 487 (2010). Finally, we generally construe exceptions to statutory provisions narrowly in order to give effect to the legislative intent that underlies the general provisions. *R.D. Merrill Co. v. Pollution Control Hearings Bd.*, 137 Wn.2d 118, 140, 969 P.2d 458 (1999).

¶34 Here, RCW 37.12.010 provides a geographical exception to the State's general assumption of both criminal and civil jurisdiction. That exception applies

---

[7] The rest of RCW 37.12.010 lists exceptions to the limitation on Washington's assumption of jurisdiction that are not relevant here.

to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States . . . .

RCW 37.12.010. To fall within the exception, an act must occur

- on tribal lands or allotted lands;
- within an established Indian reservation;
- and on land held in trust by the United States or subject to a restriction against alienation imposed by the United States.

As noted by the majority, the parties all read the requirement " 'within an established Indian reservation' " to apply to both tribal lands and allotted lands. Majority at 680 n.3 (quoting RCW 37.12.010). The majority suggests that it would be possible to construe the statute so that "within an established Indian reservation" modifies only allotted lands, not tribal lands. *Id.* But reading RCW 37.12.010 as a whole demonstrates that tribal lands must be within an established reservation. The State assumed jurisdiction over "Indians and Indian territory, reservations, country, and lands . . . ." RCW 37.12.010. If the exception to this jurisdiction included all "tribal lands," the statute would be left in an interpretive morass in which courts attempt to distinguish between Indian territory/country and tribal lands.

¶35 The critical issue then becomes whether Maryhill is "within an established Indian reservation." The history leading to the creation of the in-lieu fishing access sites demonstrates that they are not "Indian reservations." We look to the history of a statute when interpreting the legislative intent. *State v. Harvill*, 169 Wn.2d 254, 263, 234

P.3d 1166 (2010). The history of RCW 37.12.010 reaches back to the treaty with the Yakama[8] Nation.

¶36 The Maryhill site was one of the in-lieu sites established to replace access points to accustomed Indian fishing places guaranteed by treaty but destroyed by the dams built on the Columbia River. Majority at 676-77. The treaty with the Yakama Nation created a "reservation" for the Yakama (and several other tribes) defined by a metes and bounds description. Treaty between the United States and the Yakama Nation of Indians art. II, June 9, 1855, 12 Stat. 951, 952 (Yakama treaty). The Yakama treaty explicitly refers to this land as a "reservation." *Id.* The Yakama treaty also guarantees the right to fish, both within the boundaries of the reservation and in accustomed fishing areas outside the reservation:

> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory . . . .

*Id.* art. III, at 953. Without question, the Yakama reservation is an "established Indian reservation." More to the point, the Yakama treaty distinguishes between fishing within the reservation and fishing "at all usual and accustomed places," which are clearly not within the reservation. *Id.* art. III, at 954. The Yakama treaty also reserves a specific reservation expressly for fishing at a specific location:

> [T]here is also reserved and set apart from the lands ceded by this treaty, for the use and benefit of the aforesaid confederated tribes and bands, a tract of land not exceeding in quantity one township of six miles square, situated at the forks of the Pisquouse or Wenatshapam River, and known as the

---

[8] The spelling of the name was changed from "Yakima" to "Yakama" in 1994 to reflect the native pronunciation. *United States v. Confederated Tribes of Colville Indian Reservation*, 606 F.3d 698, 701 n.2 (9th Cir. 2010).

"Wenatshapam fishery," which said reservation shall be surveyed and marked out whenever the President may direct, and be subject to the same provisions and restrictions as other Indian reservations.

*Id.* art. X, at 954. "The center of the Wenatshapam Fishery was the confluence of Icicle Creek and the Wenatchee River in north central Washington State near the modern-day town of Leavenworth." *United States v. Confederated Tribes of Colville Indian Reservation*, 606 F.3d 698, 701 (9th Cir. 2010). The Wenatshapam Indians were parties to the Yakama treaty and have also been known as the "Wenatchi" or "Wenatchee." *Id.* at 701 n.1.

¶37 In short, the Yakama treaty establishes a "reservation," guarantees fishing rights on the reservation, guarantees fishing rights at accustomed sites off-reservation, and establishes a separate reservation at a specific fishing site. This tells us that the accustomed fishing sites not included in the metes and bounds description within the Yakama treaty are not part of the established Yakama reservation or the Wenatshapam reservation.

¶38 In 1988, Congress authorized creation of in-lieu fishing sites for use by the Indians. Pub. L. No. 100-581, § 401, 102 Stat. 2938 (1988). Congress directed that "[a]ll federal lands" within the areas described on maps on file in specific offices be administered "to provide access to usual and accustomed fishing areas and ancillary fishing facilities for members of the Nez Perce Tribe, the Confederated Tribes of Umatilla Indian Reservation, the Confederated Tribes of the Warm Springs Reservation of Oregon, and the Confederated Tribes and Bands of the Yakima Indian Nation." *Id.* § 401(a). In addition, Congress authorized the acquisition of six additional sites "for the purpose of providing access and ancillary fishing facilities" for the Nez Perce and the three confederated tribes. *Id.* § 401(b)(1).

¶39 Congress referred to these places as "lands" and "sites," but never as "reservations." This history of these sites contradicts any conclusion that any in-lieu site should

be considered to be an "established Indian reservation." Surely Congress must intend to "establish" an Indian reservation in order to have an "established Indian reservation." But there is not the slightest indication that Congress thought it was establishing a reservation by creating the in-lieu sites.

¶40 The majority errs by ignoring the qualifier "established." This leads the majority to find a reservation simply because Congress authorized the secretary of the army to purchase six in-lieu sites and improve them for access to fishing. Creation of an Indian reservation must be more purposeful than this. The majority again errs when it resorts to generalized dictionary definitions of "reservation," ignoring the requirement of establishment as a reservation.

¶41 The majority relies primarily on a federal interpretation of federal criminal jurisdiction in *United States v. Sohappy*, 770 F.2d 816 (9th Cir. 1985) (*Sohappy* I), *cert. denied*, 477 U.S. 906 (1986). Majority at 680-83. The site at issue in *Sohappy* I, Cooks Landing, was acquired by the federal government in 1945 to replace Indian fishing grounds that were submerged or destroyed in the process of building the Bonneville Dam. *Sohappy* I, 770 F.2d at 823. Maryhill was established as a treaty fishing access site under a similar statute in 1988. *See* § 401, 102 Stat. at 2944. Cooks Landing was acquired for the *"use and benefit"* of certain Indian tribes, including the Yakama. *Sohappy* I, 770 F.2d at 823 (citing 59 Stat. 22 (1945)). Maryhill was established as part of an effort to satisfy the same federal commitment that gave rise to Cooks Landing. *See* S. Rep. No. 100-577, at 22 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3908, 3912.

¶42 *Sohappy* I considered whether the Cooks Landing in-lieu fishing access site was within the definition of "Indian country" for purposes of chapter 53 of 18 U.S.C.: "the term 'Indian country', as used in this chapter . . . , means (a) all land within the limits of any Indian reservation under

the jurisdiction of the United States Government . . . ." 18 U.S.C. § 1151. Acknowledging that the term "Indian reservation" was not defined by statute, *Sohappy* I relied on a prior United States Supreme Court case: "[T]he Supreme Court in *United States v. John*, 437 U.S. 634, 649, 98 S. Ct. 2541, 2549, 57 L. Ed. 2d 489 (1978), suggested that land 'declared by Congress to be held in trust by the Federal Government for the benefit of the . . . Indians [is a] "reservation," at least for the purposes of federal criminal jurisdiction [under 18 U.S.C. § 1153].' " *Sohappy* I, 770 F.2d at 822 (most alterations in original).

¶43 We are not concerned here, as was *Sohappy* I, with determining federal criminal jurisdiction over Indian country. Rather, we are concerned with our own Washington statute written in light of treaties reached in Washington Territory in 1855 that clearly distinguish between established reservations and fishing rights off-reservation.

¶44 The majority's reliance on *Sohappy* I, 770 F.2d 816, which necessarily relies on *John*, 437 U.S. 634, ignores the differences between this case and *John*. The Indian lands in *John* had actually been declared an Indian reservation, albeit after their initial purchase. *Id.* at 649. Maryhill has never been declared an Indian reservation. And unlike the Choctaw land in *John*, Maryhill was set aside for the narrow purpose[9] of providing access to treaty fishing places.

¶45 The majority's adoption of the reasoning of the Ninth Circuit Court of Appeals in *Sohappy* I leads the majority to rely as well on our prior decision in *Sohappy* II,

---

[9] That narrow purpose is expressed in the federal regulations governing the site. *See* 25 C.F.R. § 247.7 (structures built on the sites limited); 25 C.F.R. § 247.9(a) (residential use prohibited); 25 C.F.R. § 247.19 (use of sites limited to fishing activities; other commercial uses prohibited). These limitations are incompatible with the general uses for which Indian reservations are created. Maryhill is different than other usual and accustomed fishing sites, in that Maryhill is set aside for the exclusive use of Indians rather than open for shared and equitable use. Majority at 684. But it is also fundamentally different from Indian reservations, in that its use is limited to treaty fishing and related activities.

110 Wn.2d 907.[10] Majority at 685. As the majority notes, we said in *Sohappy* II, "Our holding is narrowly limited to the in-lieu site here involved." 110 Wn.2d at 909. We limited our holding because we relied entirely on the decision of the Ninth Circuit in *Sohappy* I and because the State's briefing was "of no use to this court." *Id.*

¶46 A more important reason not to rely on *Sohappy* II is that we assumed incorrectly that federal jurisdiction over Cooks Landing would preempt state jurisdiction:

> The in-lieu site obviously is not within the original boundaries of the reservation itself described in the 1855 treaty; however, it is a part of a reservation for purposes of application of our state jurisdiction statute. The Ninth Circuit has held that the Cooks Landing site is within an Indian reservation. This vests exclusive jurisdiction in the federal and tribal governments as stated by the United States Supreme Court in *Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, [439 U.S. 463, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979)]. It necessarily follows that RCW 37.12.010, by its terms, excludes state jurisdiction over this site.

*Id.* at 911. We held that the federal government had exclusive jurisdiction based on *Arquette v. Schneckloth*, 56 Wn.2d 178, 182-83, 351 P.2d 921 (1960). We failed to note that *Arquette* was decided before the legislature assumed jurisdiction over Indian country in RCW 37.12.010. At the time of *Arquette*, Washington would assume jurisdiction over an Indian reservation only if the tribe voluntarily ceded jurisdiction to the State, which had not happened in that case. *See State v. Squally*, 132 Wn.2d 333, 937 P.2d 1069 (1997) (discussing historical background).

¶47 Thus, this court held in *Sohappy* II that Cooks Landing was a reservation for purposes of state law because *Sohappy* I preempted the application of state law. With the

---

[10] Although the defendants in both cases share the surname Sohappy, the individuals are not the same. The named defendant in the federal case was David Sohappy Sr., while the defendant in the state case was Steve Gary Sohappy. *Compare* 770 F.2d at 816, *with* 110 Wn.2d at 907.

passage of RCW 37.12.010, the analysis of *Sohappy* II is no longer valid.

¶48 Common sense also tells us that the Maryhill fishing access site is not a reservation. It makes sense for the State to refrain from enforcing state law on an established reservation because the tribe can maintain law and order through a regular police force. But there is no regular Indian police force at an isolated site like Maryhill. Law enforcement officers also need clear boundaries within which they can exercise the power of the State. Established reservations provide such clear boundaries; a potpourri of in-lieu fishing access sites does not.

¶49 The majority seeks to bolster its conclusion by mentioning that the Bureau of Indian Affairs "expressed its agreement that 'the States do not have regulatory jurisdiction or authority over the in-lieu fishing sites.' " Majority at 686 (quoting Use of Columbia River Treaty Fishing Access Sites, 62 Fed. Reg. 50,886, 50,867 (Sept. 29, 1997)). We do not defer to the Bureau of Indian Affairs in interpreting Washington statutes, particularly a bureau declaration issued four decades after Congress authorized Washington to assume jurisdiction over Indian country and three decades after Washington assumed that jurisdiction.

¶50 When Washington assumed criminal jurisdiction over Indian territory, it limited this jurisdiction to Indian reservations. Because I believe that we must perform our own analysis of Maryhill's reservation status, and because I do not believe that Maryhill is an Indian reservation, I respectfully dissent.

MADSEN, C.J., and J.M. JOHNSON, J., concur with WIGGINS, J.

Reconsideration denied June 7, 2012.