

This opinion was filed for record
at 8:00 am on March 19, 2015

Ronald R. Carpenter
Supreme Court Clerk

IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Respondent, | ) | No. 90906-7 |
| | ) | |
| v. | ) | |
| | ) | En Banc |
| HOWARD JOHN EVANS SHALE, | ) | |
| | ) | |
| Appellant. | ) | Filed **MAR 1 9 2015** |
| | ) | |

GONZÁLEZ, J.—We are asked to decide whether Washington State has the power to prosecute an enrolled member of the Yakama Nation living on the Quinault Indian Nation's reservation for failing to register with the county sheriff as a sex offender. We find the State has that power and affirm.

FACTS

Howard Shale is an enrolled member of the Yakama Nation. He has family in the Quinault Indian Nation as well. In 1997, Shale was convicted of raping a child under 12 in violation of 18 U.S.C. § 2241(c). After Shale was released from prison, he moved to Seattle and registered as a sex offender with the King County sheriff.

In 2012, a Jefferson County sheriff's detective began investigating whether Shale had moved to her county without reregistering as a sex offender. At least two officers assisted the detective in her investigation; a Jefferson County sheriff's deputy and a Quinault tribal police officer. One officer went to Shale's father's home, which may have been in Clallam County, and spoke to Shale himself. Shale told the officer he had been living in his father's home for at least three months. The tribal police officer went to the Quinault reservation in Jefferson County and spoke to several people there. They told him Shale had been living on the reservation for approximately a year. Shale later testified that he was living on the reservation with his grandmother. Taken together, the police reports suggest Shale was dividing his time between the two family homes. Based on the detective's report, the Jefferson County prosecutor charged Shale with failure to register with the county sheriff as a sex offender under RCW 9A.44.130(1)(a).

Shale moved to dismiss the charges, arguing that "Jefferson County has no jurisdiction for the charged crime, as it is alleged to [have been] committed by a tribal member in Indian Country." Clerk's Papers (CP) at 3.[1] According to his counsel's declaration, Shale said he had registered as a sex offender with the Quinault Indian Nation but the record does not establish whether that was

---

[1] The State did not dispute that it was charging Shale with a crime committed on "Indian country," which is relevantly defined in 18 U.S.C. § 1151(a) as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government."

before or after these charges were brought. The State did not dispute that Shale was an Indian living on the Quinault reservation but argued that he was still subject to prosecution because he was not a member of the Quinault Indian Nation. Judge Harper agreed and denied the motion to dismiss, concluding that RCW 37.12.010 carved out from state authority only "Indians when on *their* tribal lands," not tribal members while on another tribe's land. RCW 37.12.010 (emphasis added), *quoted in* CP at 9, 18. Nothing in the record establishes the Quinault Indian Nation's views on this prosecution.[2]

Shale stipulated to the police records and was convicted at a bench trial. Shale appealed, initially raising only two assignments of error: that "[t]he trial court lacked jurisdiction because Mr. Shale is a member of a federally recognized Indian tribe and his offense occurred on the Quinault reservation" and "[t]he trial court erred by finding Mr. Shale guilty and sentencing him for failure to register as a sex offender." Appellant's Opening Br. at 1. A Court of Appeals commissioner considered the appeal on the merits and affirmed. Ruling Affirming J. & Sentence (No. 44654-5-II) at 3-4. Shale successfully moved to modify the Commissioner's ruling, and, after another round of briefing where Shale raised several new issues,[3] the Court of Appeals certified

---

[2] At oral argument, counsel for Shale suggested that the tribe's attorney consulted on one of the supplemental briefs.

[3] As these new issues were not raised to the trial court or designated in his initial brief, we largely decline to consider them. RAP 2.4(a); RAP 2.5(a). To the extent that his newly raised arguments are jurisdictional, we reject them for the reasons below.

the case for our consideration, which we accepted. The Washington Association of Prosecuting Attorneys and the Washington State attorney general have filed separate amicus briefs supporting the State and raising new issues.[4]

ANALYSIS

Until the 1950s, "criminal offenses by Indians in Indian country were subject to only federal or tribal jurisdiction," not state. *State v. Cooper*, 130 Wn.2d 770, 773, 928 P.2d 406 (1996) (citing *Washington v. Confederated Bands & Tribes of the Yakima Indian Nation*, 439 U.S. 463, 470, 99 S. Ct. 740, 58 L. Ed. 2d 740 (1979) (*Yakima Indian Nation*)). States had little lawful authority on tribal lands—so little that the United States Supreme Court observed that "[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history." *Rice v. Olson*, 324 U.S. 786, 789, 65 S. Ct. 989, 89 L. Ed. 1367 (1945) (citing *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1832), *abrogation recognized by Nevada v. Hicks*, 533 U.S. 353, 361, 121 S. Ct. 2304, 150 L. Ed. 2d 398 (2001)). To that end, the enabling act that brought Washington State into the union limited the state's authority over Indian lands, which "'remain[ed] under the absolute jurisdiction and control of the Congress of the United States.'" *State v. Paul*, 53 Wn.2d

---

[4] While we are grateful for amici's assistance, we decline to reach the issues that only they raise. *See State v. Evans*, 154 Wn.2d 438, 457, 114 P.3d 627 (2005).

789, 790-91, 337 P.3d 33 (1959) (emphasis omitted) (quoting Enabling Act, ch. 180, 25 Stat. 676 (1889)). However, Washington State did assert jurisdiction over some crimes committed on tribal land involving only non-Indians. *State v. Lindsey*, 133 Wash. 140, 144, 233 P. 327 (1925) (citing *State v. Williams*, 13 Wash. 335, 43 P. 15 (1895)).

The formal relationship between the states and the tribal nations changed dramatically in 1953, when Congress enacted Public Law 280 (Pub. L. No. 83-280, 67 Stat. 588 (1953)). That act required some states and authorized others to "assume[] . . . jurisdiction over Indians" within a State's borders. *Paul*, 53 Wn.2d at 791. In 1957, our state "opted for state jurisdiction . . . for any tribe that would give its consent." DUANE CHAMPAGNE & CAROLE GOLDBERG, CAPTURED JUSTICE: NATIVE NATIONS AND PUBLIC LAW 280 at 17-18 (2012) (citing *Yakima Indian Nation*, 439 U.S. 463); *see also* LAWS OF 1957, ch. 240. Soon afterwards, a group purporting to represent the Quinault Tribal Council requested the State assume civil and criminal jurisdiction over the Quinault reservation, and Governor Rosellini, on behalf of the State, agreed. *Quinault Tribe of Indians v. Gallagher*, 368 F.2d 648, 652 (9th Cir. 1966).

In 1963, the state "assert[ed] *nonconsensual* civil and criminal jurisdiction over all Indian country with certain exceptions" not relevant here. *Cooper*, 130 Wn.2d at 773 (citing ch. 37.12 RCW); CHAMPAGNE & GOLDBERG, *supra*, at 17-18. The legislature may have been motivated by an

attorney general report that concluded few of the tribes at the time had tribal judicial systems prepared for the change. *See* Allen Lane Carr & Stanley M. Johnson, Comment, *Extent of Washington's Criminal Jurisdiction over Indians*, 33 WASH. L. REV. & ST. B. J. 289, 292 n.16 (1958) (citing Richard F. Broz, Office of Att'y Gen., Legal Problems Concerning Indians and Their Rights under Federal and State Laws) (Oct. 20, 1954) (unpublished manuscript)). While the available legislative history of RCW 37.12.010 is sparse, there was debate on the senate floor on a proposed amendment that would have conditioned acceptance of jurisdiction on a promise of reimbursement to the affected counties for the costs associated with the assumption of jurisdiction from the United States Bureau of Indian Affairs. SENATE JOURNAL, 38th Leg., Reg. Sess., at 213 (Wash. 1963). This amendment may have been inspired by the fact that Public Law 280 did not include "any federal funding support for the states' new law enforcement and criminal justice duties." CHAMPAGNE & GOLDBERG, *supra*, at 13. The amendment failed, and Governor Rosellini signed the bill into law.

Soon afterwards, our State began to reconsider its broad, nonconsensual assertion of authority over Indian tribes. In 1965, at the request of the Quinault Indian Nation, Governor Rosellini attempted to withdraw his early acceptance of state jurisdiction and return jurisdiction to the federal government. *Comenout v. Burdman*, 84 Wn.2d 192, 198, 525 P.2d 217 (1974). This return

of jurisdiction from the state to the federal government in the aftermath of Public Law 280 is commonly referred to as "retrocession." *E.g., id.* Three years later, Congress passed legislation that explicitly allowed states to request to retrocede previously claimed jurisdiction over tribes to the federal government and required tribal consent for future extension of state jurisdiction over Indians and Indian tribes. *Cooper*, 130 Wn.2d at 774 (citing 25 U.S.C. §§ 1321-1323); Pub. L. 90-284, 82 Stat. 77; 33 Fed. Reg. 17339 (1968). The 1968 act did not invalidate prior assumptions of state jurisdiction. *Cooper*, 130 Wn.2d at 774 (citing *In re Estate of Cross*, 126 Wn.2d 43, 47, 891 P.2d 26 (1995)).

Setting up the question we need to answer today, the federal government accepted only partial retrocession. *Comenout*, 84 Wn.2d at 198. Specifically, the Department of the Interior Secretary Walter Hickel, on behalf of the federal government, "accept[ed] . . . retrocession to the United States of all jurisdiction exercised by the State of Washington over the Quinault Indian Reservation, *except as provided under Chapter 36, Laws of 1963* (RCW 37.12.010-37.12.060)." Notice of Acceptance of Retrocession of Jurisdiction, 34 Fed. Reg. 14288 (Aug. 30, 1969) (emphasis added). Chapter 37 RCW says in most relevant part that "[t]he state of Washington hereby obligates and binds itself to assume criminal . . . jurisdiction over Indians and Indian territory . . . , *but such*

*assumption of jurisdiction shall not apply to Indians when on their tribal lands.*" RCW 37.12.010 (emphasis added).

Some decades later, the United States Supreme Court concluded that the tribal courts of one tribe did not have jurisdiction over members of other tribes. In response, Congress enacted legislation "permitting a tribe to bring certain tribal prosecutions against nonmember Indians . . . . [by] enlarg[ing] the *tribes'* own 'powers of self-government'" to include "'exercis[ing] criminal jurisdiction over *all* Indians,' including nonmembers." *United States v. Lara*, 541 U.S. 193, 198, 124 S. Ct. 1628, 158 L. Ed. 2d 420 (2004) (quoting 25 U.S.C. §1301(2) and citing *Duro v. Reina*, 495 U.S. 676, 110 S. Ct. 2053, 109 L. Ed. 2d 693 (1990); Act of Oct. 28, 1991, Pub L. 102-137, 105 Stat. 646). This legislation was upheld by the court in *Lara* on the theory that Congress has the power to "relax[] restrictions on the bounds of the inherent tribal authority that the United States recognizes." *Id.* at 207. Nothing in the act itself addressed whether this post-*Duro* tribal jurisdiction is exclusive of any state jurisdiction.

In 2008, our Court of Appeals partially synthesized this history and ruled that "except for the enumerated categories listed in RCW 37.12.010, the State lacks criminal jurisdiction over members of the Quinault Tribe while on tribal lands within the reservation." *State v. Pink*, 144 Wn. App. 945, 952, 185 P.3d 634 (2008) (citing *Cooper*, 130 Wn.2d at 774). Pink was a member of the

Quinault Indian Nation, and the court had no occasion to consider whether the State lacked criminal jurisdiction over members of other tribes while on Quinault tribal lands. In 2012, the Washington Legislature passed a bill that formalized a process for full or partial retrocession of state jurisdiction over members of a tribe back to the federal government. LAWS OF 2012, ch. 48, *codified as* RCW 37.12.160-.180.[5]

It is against this backdrop that we consider the question presented: whether the State has jurisdiction to prosecute Shale, a member of the Yakama Nation, for failing to register as a sex offender while living on the Quinault reservation. We review jurisdictional questions de novo. *State v. Jim*, 173 Wn.2d 672, 678, 273 P.3d 434 (2012) (citing *State v. Squally*, 132 Wn.2d 333, 340, 937 P.3d 1069 (1997)). Both the state and a tribe may have jurisdiction in any given criminal case, and prosecution by one does not bar the other from also charging an offender with a crime arising out of the same conduct. *State v. Moses*, 145 Wn.2d 370, 374, 37 P.3d 1216 (2002) (citing *State v. Schmuck*, 121 Wn.2d 373, 381, 850 P.2d 1332 (1993)). Washington's assumption of criminal jurisdiction provides in most relevant part:

> The state of Washington hereby obligates and binds itself to assume criminal and civil jurisdiction over Indians and Indian territory, reservations, country, and lands within this state in accordance with the consent of the United States given by the act of August 15, 1953 (Public Law 280, 83rd Congress, 1st Session), but such assumption of

---

[5] We are unaware of any steps taken by the Quinault Indian Nation to initiate this process.

> jurisdiction shall not apply to Indians when on their tribal lands or allotted lands within an established Indian reservation and held in trust by the United States or subject to a restriction against alienation imposed by the United States, unless the provisions of RCW 37.12.021 have been invoked. . . .
>
> [Eight specific civil subject areas omitted.]
>
> . . . PROVIDED FURTHER, That Indian tribes that petitioned for, were granted and became subject to state jurisdiction pursuant to this chapter on or before March 13, 1963 shall remain subject to state civil and criminal jurisdiction as if chapter 36, Laws of 1963 had not been enacted.

RCW 37.12.010 (reviser's note omitted). This statute limits state jurisdiction over crimes committed on trust or allotment land within reservation borders. *See State v. Clark*, 178 Wn.2d 19, 25, 308 P.3d 590 (2013).[6] Since the federal government accepted retrocession of the state's previously asserted jurisdiction over the Quinault Indian Nation subject to this provision, the question turns in large part on whether this statute retains or retrocedes criminal jurisdiction over

---

[6] We note that Shale bears the "'burden of contesting'" jurisdiction, which "requires only that the defendant point to evidence that has been produced and presented to the court, which, if true, would be sufficient to defeat state jurisdiction." *State v. L.J.M.*, 129 Wn.2d 386, 395, 918 P.2d 898 (1996) (citing *State v. L.J.M.*, 79 Wn. App. 133, 141, 900 P.2d 1119 (1995)). It is questionable whether Shale has met that burden. Shale's attorney conceded at oral argument before this court that nothing in the police reports to which Shale stipulated establishes whether he resided on fee, trust, or allotment land. Wash. Supreme Court oral argument, *State v. Shale*, No. 90906-7 (Feb. 12, 2015), at 38 min., 58 sec. through 39 min., *audio recording by* TVW, Washington State's Public Affairs Network, *available at* http://www.tvw.org. However, the State has not chosen to raise this issue and so we assume without deciding that Shale was living on trust or allotment land within the tribe's jurisdictional boundaries at the relevant time.

crimes committed on Quinault tribal lands by members of other tribes, and on whether asserting jurisdiction would undermine tribal sovereignty.

We find the State does have criminal jurisdiction in this case. Asserting jurisdiction is consistent with the "'two independent but related barriers'" that the United States Supreme Court observes limit "the assertion of state authority over tribal reservations." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g, PC*, 467 U.S. 138, 147, 104 S. Ct. 2267, 81 L. Ed. 2d 113 (1984) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142, 100 S. Ct. 2578, 65 L. Ed. 2d 665 (1980)). "First, a particular exercise of state authority may be foreclosed because it would undermine 'the right of reservation Indians to make their own laws and be ruled by them.'" *Id.* (internal quotation marks omitted) (quoting *White Mountain*, 448 U.S. at 142); *see also Yakima Indian Nation*, 439 U.S. at 470-71 (quoting *Williams v. Lee*, 358 U.S. 217, 219-20, 79 S. Ct. 269, 3 L. Ed. 2d 251 (1959)); *Clark*, 178 Wn.2d at 26. "Second, state authority may be pre-empted by incompatible federal law." *Wold*, 467 U.S. at 147 (citing *White Mountain*, 448 U.S. at 142).

We are not persuaded that prosecuting Shale infringes on the right of the tribe to make its own laws and be ruled by them. No treaty protection against state jurisdiction is asserted. The tribe is free to bring its own prosecution if it wishes, and there is nothing in the record that suggests the tribe feels that this prosecution infringes on its rights. Allowing the State to assert jurisdiction is

11

consistent with United States Supreme Court precedent. For example, the high court has found that imposing Washington state tax law on nonmember Indians living on a reservation does not undermine tribal sovereignty. The court observed:

> Federal statutes, even given the broadest reading to which they are reasonably susceptible, cannot be said to pre-empt Washington's power to impose its taxes on Indians not members of the Tribe. We do not so read the Major Crimes Act, 18 U. S. C. § 1153, which at most provides for federal-court jurisdiction over crimes committed by Indians on another Tribe's reservation. Cf. *United States* v. *Antelope*, 430 U. S. 641, 646-647, n. 7[, 97 S. Ct. 1395, 51 L. Ed. 2d 701] (1977). Similarly, the mere fact that nonmembers resident on the reservation come within the definition of "Indian" for purposes of the Indian Reorganization Act of 1934, 48 Stat. 988, 25 U. S. C. § 479, does not demonstrate a congressional intent to exempt such Indians from state taxation.
>
> Nor would the imposition of Washington's tax on these purchasers contravene the principle of tribal self-government, for the simple reason that nonmembers are not constituents of the governing Tribe. For most practical purposes those Indians stand on the same footing as non-Indians resident on the reservation.

*Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 160-61, 100 S. Ct. 2069, 65 L. Ed. 2d 10 (1980); *accord Montana v. United States*, 450 U.S. 544, 565-66, 101 S. Ct. 1245, 67 L. Ed. 2d 493 (1981) ("[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe.") Similarly, we have recently held that it does not infringe on a tribe's right to self-rule to respect a tribal enterprise's

12

consent to state court jurisdiction. *Outsource Servs. Mgmt., LLC v. Nooksack Bus. Corp.*, 181 Wn.2d 272, 277, 333 P.3d 380 (2014).

We also note that the tribe is very concerned about sexual assault and may well welcome the State's assistance in prosecuting unregistered sex offenders who come to its land. The Quinault Indian Nation's criminal code states that "[a]n astounding thirty percent of Indian and Alaska Native women will be raped in their lifetimes. Tribal nations are disproportionately affected by violent crime and Sex Offenses in particular from both Indian and Non-Indian perpetrators." State's Resp. to Appellant's Suppl. Br. App. A (Quinault Tribal Code § 12.11.103). "According to federal health statistics, one in every four Native girls and one in every seven Native boys will be sexually abused." Virginia Davis & Kevin Washburn, *Sex Offender Registration in Indian Country*, 6 OHIO ST. J. CRIM. L. 3, 3 (2008) (citing United States Department of Health and Human Service's Indian Health Service Child Abuse Project). In this case, a tribal officer assisted in the criminal investigation, which suggests the tribe knew about the prosecution, had an opportunity to intervene, and made the deliberate decision not to. In the absence of evidence in the record that the tribe feels this prosecution undermines its sovereignty, we conclude that this

prosecution does not undermine the tribe's ability to make its own laws and be ruled by them.[7]

Second, whether state authority is preempted by incompatible federal law primarily turns on the scope of the authority that remained after the federal government accepted partial retrocession of jurisdiction over the Quinault Indian Nation, which, in this case, largely depends on the meaning of RCW 37.12.010, since the federal acceptance of retrocession was subject to that statute. 34 Fed. Reg. 14288.[8] Our "fundamental objective" in statutory interpretation "is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002) (citing *State v. J.M.*, 144 Wn.2d 472, 480, 28 P.3d 720 (2001)). While we recognize that there is some dispute in the historical record, the weight of the evidence

---

[7] Shale also suggests that the sex offender registration statute is in essence a civil regulatory system that is beyond the State's power to enforce on Indian tribal land. Appellant's Suppl. Br. at 4-5 & n.1 (citing *Smith v. John Doe*, 538 U.S. 84, 105, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003); *State v. Ward*, 123 Wn.2d 488, 496-507, 869 P.2d 1062 (1994)). Both *Smith* and *Ward* considered whether the registration requirement *itself* was punitive in nature and therefore could not be applied to offenders who committed their crimes before it was enacted without violating the ex post facto clause. *Smith*, 538 U.S. at 97; *Ward*, 123 Wn.2d at 510-11. Both courts rejected the argument. *Smith*, 538 U.S. at 97; *Ward*, 123 Wn.2d at 510-11. Neither case suggests that prosecution for failure to register was in essence the enforcement of a civil regulatory scheme that would run afoul the principal that states lack civil regulatory jurisdiction except as explicitly set forth by statute. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 206-07, 107 S. Ct. 1083, 94 L. Ed. 2d 244 (1987).

[8] For the first time after his appeal had been rejected below, Shale argued that the federal Sex Offender Registration and Notification Act (SORNA), Pub. L. 109-248, 120 Stat. 590, as applicable to this case deprives the State of jurisdiction. While we do not mean to forestall a more timely and better developed challenge in some future case, nothing in SORNA that has been called to our attention by the parties in this case preempts state law or deprives the State of jurisdiction.

14

persuades us that in 1957 and 1963, when the Washington Legislature passed and amended RCW 37.12.010, and in 1969, when Secretary Hickel accepted retrocession, neither this state nor the federal government would have understood that one tribe's courts could have jurisdiction over members of another tribe. In 1978, the United States Supreme Court observed that Indian tribes did not have the jurisdiction to try members of other tribes. *See United States v. Wheeler*, 435 U.S. 313, 326, 98 S. Ct. 1079, 55 L. Ed. 2d 303 (1978) (citing *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S. Ct. 1011, 55 L. Ed. 2d 209 (1978)).[9] Finally, in 1990, the United States Supreme Court squarely held that tribal courts did not have jurisdiction over other members of other tribes. *Duro*, 495 U.S. at 679.[10] Taken together, we find that the federal government accepted retrocession of state jurisdiction over members of the Quinault Indian Nation only while on their Quinault reservation. 34 Fed. Reg. 14288; RCW 37.12.010-.060.[11] Since Shale is not a member of the Quinault Indian Nation, the State has jurisdiction.

---

[9] *Wheeler*, of course, was decided before Congress permitted tribes to exercise "'criminal jurisdiction over *all* Indians,' including nonmembers." *Lara*, 541 U.S. at 198 (quoting 25 U.S.C. §1301(2) and citing Act of Oct. 28, 1991, 105 Stat. 646). We cite it only as evidence of what the Washington legislature and Secretary Hickel would have understood chapter 37.12 RCW to mean at the time.

[10] We recognize that the authorities are not unanimous. For example, *Duro* resolved a circuit split between the Ninth Circuit, which (by a divided panel) held that tribal courts did have such jurisdiction over nonmember Indians, and the Eight Circuit, which held they did not. *Duro*, 495 U.S. at 683-84 (citing *Duro v. Reina*, 860 F.2d 1463 (9th Cir. 1988); *Greywater v. Joshua*, 846 F.2d 486 (8th Cir. 1988)).

[11] For this reason, we find Shale's argument that State courts only have concurrent jurisdiction with tribal courts when such jurisdiction has been explicitly granted by

15

CONCLUSION

We affirm the courts below and hold that the State has jurisdiction to prosecute Shale for failure to register as a sex offender while living on the Quinault reservation.

---

statute unavailing. Appellant's Resp. to Br. of Amicus Curiae at 1 (citing *State ex rel. Adams v. Superior Court*, 57 Wn.2d 181, 186, 356 P.2d 985 (1960)). Public Law 280 and RCW 37.12.010 together do grant such jurisdiction.

Gonzáles, J.

WE CONCUR:

Madsen, C.J.

Stephen, J.

Johnson, J.

Wiggins, J.

Owens, J.

Gordon McCloud, J.

Fairhurst, J.

Yu, J.