IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

DIVISION ONE

| | |
|---|---|
| ANA LIZA GARCIA; CARMEN PACHECO-JONES; AND NATALYA SEMENENKO, | No. 79647-0-I |
| Appellants, | DIVISION ONE |
| CHRISTINE NIXON, | |
| Plaintiff, | |
| v. | |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES, STATE OF WASHINGTON, | PUBLISHED OPINION |
| Respondent, | |
| SECRETARY OF THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, AND SECRETARY OF STATE, | |
| Defendants. | FILED: September 3, 2019 |

ANDRUS, J. — Ana Liza Garcia, Carmen Pacheco-Jones, and Natalya Semenenko (Appellants) contend the Department of Social and Health Services (DSHS) unfairly denied them the ability to work as caregivers to vulnerable adults. Under RCW 74.39A.056, these women are prohibited from being employed as long-term care workers because each has a disqualifying finding of child abuse or neglect. We therefore affirm the dismissal of their claims.

## I. BACKGROUND OF DISPUTE

### A. DSHS

DSHS is the Washington state agency responsible for coordinating the care of individuals who, because of their economic, social, or health condition, require financial assistance, institutional care, rehabilitation services, or other social and health services. RCW 43.20A.010. It provides services to "functionally disabled" persons—defined as individuals who, because of a recognized chronic physical or mental condition or disease, are "dependent upon others for direct care, support, supervision, or monitoring to perform activities of daily living," including bathing, toileting, and dressing. RCW 74.39A.240, .009(23). DSHS administers programs for older adults through the Aging and Long-Term Support Administration (ALTSA), and for individuals with developmental disabilities through the Developmental Disabilities Administration (DDA). ALTSA and DDA hire people to provide intimate care for these vulnerable individuals, and there is little supervision or state oversight.

In 1997, the legislature passed the Long-Term Care Reorganization and Standards of Care Reform Act, which banned individuals who committed the abuse or neglect of minors or vulnerable adults from employment in positions with unsupervised access to vulnerable adults:

> No provider or staff, or prospective provider or staff, with a stipulated finding of fact, conclusion of law, an agreed order, or finding of fact, conclusion of law, or final order issued by a disciplining authority, a court of law, or entered into a state registry finding him or her guilty of abuse, neglect, exploitation, or abandonment of a minor or a vulnerable adult as defined in chapter 74.34 RCW shall be employed in the care of and have unsupervised access to vulnerable adults.

- 2 -

LAWS OF 1997, ch. 392, § 209(8) (initially codified at former RCW 74.39A.050).

In November 2011, the voters of Washington passed Initiative Measure No. 1163, requiring criminal background checks for all long-term care workers.[1] LAWS OF 2012, ch.1. Initiative 1163 required DSHS to perform background checks of all prospective "individual providers."[2] RCW 74.39A.261. It also retained the employment ban instituted in 1997. LAWS OF 2012, ch.1, § 106 (recodified as former RCW 74.39A.051). Then, in March 2012, the legislature amended and relocated the employment ban into what is now RCW 74.39A.056(2), with slightly modified language:

> No provider, or its staff, or long-term care worker, or prospective provider or long-term care worker, with a stipulated finding of fact, conclusion of law, an agreed order, or finding of fact, conclusion of law, or final order issued by a disciplining authority or a court of law or entered into a state registry with a final substantiated finding of abuse, neglect, exploitation, or abandonment of a minor or a vulnerable adult as defined in chapter 74.34 RCW shall be employed in the care of and have unsupervised access to vulnerable adults.

LAWS OF 2012, ch. 164, § 503(2); see also LAWS OF 2012, ch. 164, § 701. The legislature added a provision requiring DSHS to establish by rule a state registry containing identifying information about long-term care workers who have abused or neglected a vulnerable adult. RCW 74.39A.056(3). The legislature authorized DSHS to adopt rules to implement all provisions of this statute. RCW 74.39A.056(4).

---

[1] "Long-term care workers" include any person who provides paid, hands-on personal care services for the elderly or persons with disabilities. RCW 74.39A.009(20)(a).

[2] An "individual provider" is a person who—either through a DSHS contract or through direct employment with the person receiving services—provides personal care or respite care to persons who are functionally disabled or otherwise eligible to receive Medicaid or similar state-funded in-home care services. RCW 74.39A.240.

B. Child Abuse and Neglect Investigations

At all times relevant to this appeal, DSHS was also responsible, through the Children's Administration and Child Protective Services (CPS), for investigating reports of child abuse or neglect under RCW 26.44.050.[3] When DSHS receives a report of alleged child abuse or neglect, it screens the report to determine if it is credible. RCW 26.44.030(11), .020(22). A credible report is considered "screened in," at which time, DSHS then decides whether to conduct a "family assessment"[4] or a formal investigation. RCW 26.44.030(11).

If DSHS chooses to respond with a family assessment, it will not make a finding as to whether child abuse or neglect occurred. RCW 26.44.030(17)(b). If, however, DSHS conducts an investigation, it assigns an investigator from CPS to determine whether a report of child abuse or neglect is "unfounded" or "founded." RCW 26.44.030(12)(a). An "unfounded" finding means that available information indicates that, more likely than not, child abuse or neglect did not occur, or that there is insufficient evidence for DSHS to determine whether the alleged child abuse did or did not occur. RCW 26.44.020(26). A "founded" finding is a

---

[3] Effective July 1, 2018, the legislature created a new department, the Department of Children, Youth and Families (DCYF), see LAWS OF 2017, 3d Spec. Sess., ch. 6, to take over the duties formerly performed by Children's Administration. DCYF now responds to reports of child abuse or neglect. LAWS OF 2017, 3d Spec. Sess., ch. 6, §§ 321-27; RCW 26.44.030(11); RCW 74.13.031(3). Although DSHS and DCYF are now different state agencies, child abuse investigation procedures and the method of appealing agency findings of abuse or neglect remain the same. For clarity, this opinion refers only to DSHS as the agency at issue as it was the agency that determined that Appellants are ineligible to work as long-term care providers.

[4] A "family assessment response" means a way of responding to certain reports of child abuse or neglect using a "differential response approach to child protective services." RCW 26.44.020(11).

determination that, based on available information, it is more likely than not that child abuse or neglect did occur. RCW 26.44.020(12).

DSHS is statutorily mandated to notify any parent of allegations of child abuse or neglect and of the agency's finding at the conclusion of its investigation. RCW 26.44.100(2). DSHS must also notify the parent that founded reports of child abuse and neglect may be considered in determining whether the parent is disqualified from being licensed to provide childcare, employed by a licensed childcare agency, or authorized by DSHS to care for children. RCW 26.44.100(2)(c). Finally, it must notify the parent of his or her right to seek review of the finding. RCW 26.44.100(2)(d).

Before Congress passed the Child Abuse Prevention and Treatment Act[5] (CAPTA) in 1997, there was no mechanism for challenging a CPS finding of child abuse or neglect. CAPTA conditioned federal funding for child welfare systems on, among other things, improving the evidentiary and investigatory standards applicable to child abuse and neglect findings. CAPTA also required states to implement laws to allow individuals to appeal any founded finding. 42 U.S.C. § 5106a(b)(2)(B)(xv)(II). Washington complied with CAPTA by October 1, 1998.

Since then, under RCW 26.44.125, any person named as an alleged perpetrator of child abuse or neglect after October 1, 1998, has the right to request agency review within 30 days of notification of a founded finding. If the alleged perpetrator fails to request review, he or she "may not further challenge the finding and shall have no right to agency review or to an adjudicative hearing or judicial

---

[5] See generally 42 U.S.C. § 5106a.

review of the finding," unless DSHS failed to comply with the statutory notice requirements. RCW 26.44.125(3). If an individual requests a review, DSHS will assign a management level staff member to conduct the review and notify the person in writing of the agency's determination. RCW 26.44.125(4). If the agency affirms the finding, the individual may seek an adjudicative hearing. RCW 26.44.125(5). Failing to request a hearing constitutes a waiver of the right to further agency or judicial review, id., and makes the finding "final," RCW 43.43.830(4).

If DSHS determines a parent has abused or neglected his or her child, it may choose to offer services to him or her to address the effects of any mistreatment or neglect. RCW 26.44.195(1). Alternatively, DSHS may initiate dependency proceedings in superior court under chapter 13.34 RCW. RCW 26.44.195(4). A dependency proceeding could result in a final court order in which the parent is found to have committed child abuse or neglect. See RCW 13.34.110 (court shall hold hearing and find, by preponderance of evidence, if child is dependent within meaning of RCW 13.34.030); RCW 13.34.030(6) ("dependent child" includes child who has been abused or neglected as defined in chapter 26.44 RCW). If a court finds by a preponderance of the evidence that a person has abused or neglected a child, DSHS "shall adopt the finding in its investigation." RCW 26.44.030(12)(b).

Under former RCW 26.44.070, DSHS maintained reported cases of child abuse in a "central registry," which was accessible by persons "directly responsible for the care and treatment of children . . . pursuant to chapter 74.15 RCW; . . . ." Dunning v. Paccerelli, 63 Wn. App. 232, 234 & n.1, 818 P.2d 34 (1991) (alterations

in original); see also Fettig v. Dep't of Soc. & Health Servs., 49 Wn. App. 466, 467 n.1, 744 P.2d 349 (1987) (department maintained central registry of child abuse pursuant to RCW 26.44.070). This central registry was confidential and privileged; information in it could be released only by court order, except for certain statutorily identified agencies and for specific purposes. See LAWS OF 1984, ch. 97, § 6.

The legislature repealed the central registry provision in 1987. LAWS OF 1987, ch. 486, § 16. But the current statutory framework nevertheless contemplates the maintenance of a database of founded child abuse findings. RCW 26.44.030(17)(a) provides that DSHS "shall maintain investigation records" of all founded cases of abuse and neglect and maintain a log of "screened-out nonabusive cases." Under RCW 26.44.030(17)(b), if DSHS chooses to conduct a family assessment, rather than an investigation, "[n]o one shall be named as a perpetrator and no investigative finding shall be entered in the department's child abuse or neglect database." See also RCW 26.44.020(11) (under a family assessment response, "no investigative finding is entered in the record").

C. DSHS Background Checks

In 1987, the legislature enacted RCW 43.43.832, requiring the Washington State Patrol (WSP) to collect and disclose to prospective employers providing services to vulnerable adults information relating to any job applicant's[6]

---

[6] RCW 43.43.830(2)(a) defines an "applicant" as "[a]ny prospective employee who will or may have unsupervised access to children under sixteen years of age or developmentally disabled persons or vulnerable adults during the course of his or her employment or involvement with the business or organization."

convictions, "adjudications of child abuse in a civil action,"[7] and "disciplinary board final decisions." LAWS OF 1987, ch. 486, § 2(1).

In 2005, the legislature amended RCW 43.43.832 to require DSHS (rather than the WSP) to "establish rules" and "set standards" for considering conviction information and administrative or court findings of abuse when licensing facilities, contracting, and paying individual providers, for the care of children, developmentally disabled persons, and vulnerable adults. See LAWS OF 2005, ch. 421, § 2(4).

To assist with this statutory requirement and fulfill its background check requirements under RCW 74.39A.261, DSHS performs background checks through its Background Check Central Unit (BCCU). WAC 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. BCCU is responsible for compiling background check information from external and internal sources, determining whether the applicant's background check information matches to the appropriate department's list of disqualifying crimes and "negative actions,"[8] and providing the information to the entity requesting the background check. WAC 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(2).

---

[7] A "civil adjudication proceeding" is "a judicial or administrative adjudicative proceeding that results in a finding of, or upholds an agency finding of, domestic violence, abuse, sexual abuse, neglect, abandonment, violation of a professional licensing standard regarding a child or vulnerable adult, or exploitation or financial exploitation of a child or vulnerable adult under any provision of law, including but not limited to chapter 13.34, 26.44, or 74.34 RCW . . . ." RCW 43.43.830(4). It also includes any judicial or administrative finding that becomes final when the alleged perpetrator does not exercise the right to administratively challenge the findings. Id.

[8] A "negative action" is defined by regulations and is a disqualifying finding or action that is not a disqualifying conviction or a pending charge for a disqualifying crime. WAC 388-113-0030. A negative action automatically disqualifies an individual from having unsupervised access to vulnerable adults or minors receiving care under specific DSHS programs. WAC 388-113-0005. Each program identifies its automatically disqualifying negative actions in its rules. See, e.g., chapter 388-78A WAC (licensed assisted living facilities); chapter 388-97 WAC (licensed nursing homes); WAC 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 (home and community services programs defining "negative action" as including "the denial, suspension, revocation, or termination of a license, certification, or contract

- 8 -

By statute, any business or organization requesting a BCCU background check must require each applicant to disclose whether the applicant has been convicted of any crime or "has had findings made against him or her in any civil adjudicative proceeding as defined in RCW 43.43.830." RCW 43.43.834(2)(b). As a result, the background check authorization form asks each applicant if "a court or state agency ever issued you an order or other final notification stating that you have sexually abused, physically abused, neglected, abandoned, or exploited a child, juvenile, or vulnerable adult?" The applicant must respond "yes" or "no." If an applicant self-discloses criminal history or a CPS founded finding, BCCU staff enters that information into BCCU's database.

BCCU then checks its own "repository" or "criminal history system" database. BCCU's database contains information on individuals from various sources, including the WSP, the Administrative Office of the Courts, the Department of Health, and DSHS's electronic database, FamLink, which contains records relating to founded findings of child abuse and neglect.

BCCU began retaining founded abuse and neglect findings in its database in January 2006. Once BCCU enters or uploads that information into its database, it remains there for any future background checks. The record does not reveal how long BCCU retains this information in its repository.

---

for the care of children, as defined in RCW 26.44.020, or vulnerable adults, as defined in RCW 74.34.020, for noncompliance with any state or federal regulation"); WAC 388-825-335 (DDA programs referring to WAC 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 for negative action definition). Exceptions to automatic disqualification are listed in WAC 388-113-0020.

The record is also unclear whether BCCU automatically receives all founded findings from FamLink as a routine matter or whether it only receives this information in response to a specific background check request. The Centralized Services Administrator for DSHS, testified that BCCU sends an inquiry to FamLink which then sends information on any individuals whose name matches that of the applicant. But according to BCCU's manager, BCCU receives a nightly upload from FamLink that includes the name and date of birth of every individual whose founded child abuse finding has become final. Regardless, BCCU receives and retains any founded findings of child abuse it receives from FamLink. DSHS provides BCCU only with founded findings made after January 1, 1999, to comply with CAPTA.[9]

DSHS promulgated three regulations at issue in this case. WAC 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(d) provides that DSHS will deny payment for the services of any individual provider or home care agency provider when he or she has a founded finding of abuse or neglect of a child under RCW 26.44.020 that is:

(i) Listed on the . . . [BCCU] report; or

(ii) Disclosed by the individual, except for findings made before December 1998. Findings made before December 1998 require a character, competence, and suitability determination.

WAC 388-825-640 similarly provides:

(2) The following negative actions will automatically disqualify an individual from having unsupervised access to individuals with a development disability:

---

[9] Pre-CAPTA founded findings are not supplied to BCCU because persons with those founded findings have not had the opportunity for agency or judicial review.

 (a) A final finding of abuse, neglect, financial exploitation or abandonment of a vulnerable adult, unless the finding was made by Adult Protective Services prior to October 2003.

 (b) A final finding of abuse or neglect by [CPS], unless the finding was made prior to October 1, 1998.

And under WAC 388-825-645, if the CPS finding predates October 1, 1998, the person is not automatically disqualified from employment with developmentally disabled individuals if he or she successfully completes a character, competence, and suitability review.[10]

Both DDA and ALTSA consider founded child abuse or neglect findings as a part of the background check process required by RCW 74.39A.261. These agencies will not contract for personal in-home care of a child or vulnerable adult with anyone who has a founded finding of child abuse or neglect. A former DDA program manager testified that because of the nature of the care DDA provides to its clients, DDA's "rules would prevent [a] contract [with someone with a founded finding of child abuse or neglect] from moving forward, period, for the protection of all vulnerable people involved." Because there is little oversight of the care providers, DDA errs on the side of protecting the State's "most vulnerable citizens" by never contracting with persons with founded abuse or neglect findings. ALTSA similarly disqualifies all applicants with founded child abuse or neglect findings.

Additionally, DSHS uses founded child abuse findings to assess individuals who seek to become licensed foster parents or to have unsupervised access to children in DSHS's care, custody, or control. It also retains the records for case

---

[10] These reviews are conducted by the entity with which the person is seeking employment. WAC 388-825-650.

management and safety planning purposes. If DSHS works with the same family over time, it uses past investigative findings of child abuse when making child safety assessments or conducting future investigations. Because DSHS has a statutory obligation to keep families united, see RCW 74.15.010(2), it has discretion to allow family members with founded findings to have unsupervised access to a child in the family. Unlike DDA and ALTSA, DSHS also has more opportunities to observe the child on a frequent basis. A DSHS caseworker assesses a child's health and safety every 30 days, and the child is often observed by other persons who must report possible child abuse or neglect, such as persons in the school system. Even with the discretion and increased opportunities for observation, DSHS often disqualifies individuals with founded findings from having children placed with them or from having unsupervised access to the children.

D. Records Retention Schedules

RCW 26.44.031(2) provides that DSHS must destroy "screened-out" reports of child abuse or neglect within three years, and it must destroy "unfounded" or "inconclusive" reports within six years of completing an investigation. The statute authorizes DSHS to keep records "concerning founded reports of child abuse or neglect as the department determines by rule." RCW 26.44.031(3). DSHS rules provide that it "shall retain records relating to founded reports of child abuse and neglect as required by DSHS records retention policies." WAC 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(5).

All government agencies must have record retention schedules for public records. RCW 40.14.060. By law, the minimum retention period for any public

record is six years. RCW 40.14.060(1). The entity authorized to approve, modify, or disapprove recommendations on retention schedules and to act on any request to destroy public records is the state records committee. RCW 40.14.050.

In 2008 and 2009, in preparing to implement FamLink, DSHS sought to harmonize its records retention policies. DSHS representatives requested that the records committee approve an extension of the records retention schedule for investigative files leading to founded abuse or neglect findings from the minimum of 6 years to 35 years. It articulated three reasons for this change. First, DSHS wanted to make the retention schedule the same as the schedule for records relating to the revocation of foster care licenses. Without the proposed extension, if DSHS revoked a foster care license based on a founded child abuse finding but the records relating to that investigation were destroyed after only six years, DSHS would be unable to determine why a license revocation occurred. Second, DSHS representatives considered it necessary to keep the investigative records for longer than six years to defend against tort claims with long statutes of limitation. Finally, DSHS wanted to preserve records relating to persons in its system as children who might want access to their abuse and neglect history years later.

The state records committee approved the request, and effective February 4, 2009, all CPS case files with a founded child abuse finding—including law enforcement reports, medical reports, court reports, court orders, child interview notes, and correspondence—are now retained for 35 years from the date of case closure.

## E. Appellant Ana Liza Garcia

In August 2009, CPS investigated a report that Garcia had been arrested for driving while under the influence with her 14-year-old wheelchair-bound son in her car. DSHS determined that the allegation of negligent treatment was founded. Although DSHS purported to notify Garcia of her right to seek a review of this finding, Garcia did not receive it.[11]

In March 2010, Garcia entered into a deferred prosecution for DUI and reckless endangerment in Lynnwood Municipal Court relating to the incident that formed the basis for the founded child abuse finding. Garcia testified she complied with the terms of her plea agreement, and the court dismissed the criminal charge in March 2015.

In August 2012, Garcia applied to become a Medicaid personal care provider for her son. She underwent a BCCU background check as a part of this application process. BCCU notified DSHS that Garcia had a "substantiated finding of abuse and/or neglect of a child." Based on this report, DSHS informed Garcia that she was disqualified from being employed in any position giving her unsupervised access to vulnerable adults or individuals with developmental disabilities.

Garcia was unaware of the CPS finding until she received this letter, despite having worked with DSHS to obtain voluntary family services after the 2009 CPS investigation. In September 2012, at Garcia's request, a Children's Administration

---

[11] DSHS sent the notice via certified mail, and after two attempts to deliver, it was returned, unclaimed.

Area Administrator reviewed and upheld the CPS finding. Children's Administration notified Garcia in writing of her right to receive an administrative hearing to challenge the finding.

Garcia requested a hearing, and an administrative law judge (ALJ) found her appeal untimely. Garcia appealed to Thurston County Superior Court,[12] which concluded that DSHS had failed to comply with RCW 26.44.100 by not providing oral notice[13] to Garcia of its adverse CPS finding when it was practicable to do so. The superior court remanded Garcia's case to DSHS for an administrative hearing.

In April 2015, after an evidentiary hearing, an ALJ found that in July 2009, Garcia had consumed a sufficient quantity of alcohol to render her unable to safely drive and thereafter drove in a manner likely to cause serious harm to her disabled son. The ALJ also found that her actions evidenced "a serious disregard of consequences of such magnitude as to constitute a clear and present danger to [her son's] health, welfare, and safety, and therefore [her actions] constitute[d] negligent treatment or maltreatment as defined by both statute and regulation." The ALJ affirmed the founded finding. Garcia did not appeal this administrative order.

DSHS stated in discovery in this lawsuit that the founded CPS finding from 2009, affirmed by the ALJ in 2015, renders Garcia "ineligible for specific DSHS-

---

[12] Ana Garcia v. Dep't of Soc. & Health Servs., No. 14-2-00100-0.

[13] While the statute does not require oral notice, the trial court concluded that because DSHS knew that Garcia did not receive the notice, due process required that the agency take additional reasonable steps, if feasible, to inform her of the finding. And because CPS was physically present in Garcia's home providing services after the certified mail notice had been returned, unclaimed, the court concluded it was feasible and practicable for DSHS to have orally notified Garcia of the finding.

regulated positions that involve supervision of children and vulnerable adults for 35 years from the date she received her founded finding."

F. Appellant Carmen Pacheco-Jones

DSHS found that Pacheco-Jones engaged in child abuse or neglect in June 1999. Pacheco-Jones did not seek review of this finding at the time it was entered.

A January 2009 BCCU background check disclosed that Pacheco-Jones had five felony convictions for possession of controlled substances, forgery, and theft. On March 13, 2009, Catholic Charities notified Pacheco-Jones it could not employ her because her DSHS background check reported a crime that disqualified her from employment with that agency.

On March 27, 2009, Pacheco-Jones asked DSHS to review the 1999 founded finding, claiming that in 1999 the agency had removed her children from her care because of drug use but, she argued, she had successfully completed treatment and regained custody of her children in 2001. On March 30, 2009, a DSHS Area Administrator refused to review the finding, citing the passage of over nine years since DSHS had mailed notice of the finding to Pacheco-Jones. And the DSHS Deputy Regional Administrator affirmed this decision shortly thereafter.

It is unclear whether Pacheco-Jones's prior felony convictions remain a disqualifying event for DSHS employment, but DSHS has indicated in this lawsuit that "due to [Appellant] Pacheco-Jones's founded finding, she is ineligible for specific DSHS-regulated positions that involve supervision of children and vulnerable adults for 35 years from the date she received her founded finding."

G. Appellant Natalya Semenenko

In April 2010, DSHS found it more probable than not that Semenenko had engaged in the physical abuse of her child. The finding was based on an incident that occurred in November 2009 when Semenenko took her teenage daughter to a facility for drug treatment. When the daughter resisted being admitted into the facility, a physical struggle ensued, during which Semenenko was observed pushing and kicking her daughter. Semenenko v. Dep't of Soc. & Health Servs., 182 Wn. App. 1052, No. 70354-4-I, 2014 WL 3936952, at *1 (Wash. Ct. App. Aug. 11, 2014). DSHS initiated an investigation through CPS, and in April 2010, Semenenko received a letter informing her of the founded finding. Id.

In November 2010, Semenenko lost her job as a caregiver for the elderly when her employer performed a routine background check and discovered her name in the DSHS database with a founded finding of child abuse. Id. at *2. Semenenko requested a review of the finding in March 2011. DSHS notified her that her request was beyond the deadline for seeking agency review and advised her she could challenge that decision by requesting a hearing with the Office of Administrative Hearings. Id.

Semenenko requested a hearing two months later. The ALJ dismissed the case, concluding that she had not requested review of the child abuse finding within the then-20-day deadline. Id. This court affirmed the decision on appeal, rejecting Semenenko's contention that DSHS had not complied with the notice requirements of RCW 26.44.100. Id. at *6.

As in the cases of Garcia and Pacheco-Jones, DSHS has indicated that "due to [Appellant] Semenenko's founded finding, she is ineligible for specific DSHS-regulated positions that involve supervision of children and vulnerable adults for 35 years form the date she received her founded finding."

H. Procedural History

In 2015, Appellants filed a petition for declaratory judgment under RCW 34.05.570(2)(a) and a complaint for declaratory and injunctive relief under 42 U.S.C. § 1983 in Thurston County Superior Court. They alleged that RCW 74.39A.056(2) bars their employment as long-term care workers only for the duration of time DSHS chooses to retain records of their founded abuse or neglect findings. They contended that DSHS's decision to change its records retention policy from 6 to 35 years effectively denies them the right to the occupation of their choice. They alleged DSHS failed to follow the Administrative Procedure Act[14] (APA) rule-making procedures when it modified its records retention policy, and they claimed that the 35-year policy was arbitrary and capricious.

In addition to challenging the 35-year retention period, Appellants alleged that DSHS should be required to give them individualized character, competence, and suitability reviews and that the rule extending such reviews only to people with pre-October 1998 findings of child abuse was arbitrary and capricious and violated the equal protection clauses and privileges and immunities clause of the Fourteenth Amendment and article I, sections 3 and 12 of the Washington State Constitution.

---

[14] Chapter 34.05 RCW.

- 18 -

DSHS moved for partial summary judgment, arguing that Appellants failed to plead a viable § 1983 claim or that the claim was time-barred. The superior court dismissed the § 1983 claim but permitted Appellants to proceed with their APA and constitutional challenges to WAC 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(5)(d), 388-825-640(2)(b), and 388-825-645 and with their APA rule-making challenge to DSHS's recommendation for a 35-year records retention schedule.[15]

I. Trial Court's Findings of Fact & Conclusions of Law

The trial court authorized the parties to supplement the administrative record with additional evidence as allowed under RCW 34.05.558, RCW 34.05.562, and RCW 34.05.570(4). After considering deposition testimony, answers to interrogatories, and records produced by DSHS, Children's Administration, and BCCU, the trial court issued its ruling.

The trial court found that each Appellant applied for employment as long-term care workers as defined in RCW 74.39A.009, positions that would give her unsupervised access to vulnerable persons. Each also had founded findings of child abuse or neglect, issued after Washington came into compliance with CAPTA. These findings were available from Children's Administration and were sent to BCCU when BCCU reviewed Appellants' backgrounds. After BCCU reviewed records available to it, including the Appellants' founded child abuse or neglect findings, DSHS denied authorization for each Appellant to work in long-term care positions that required unsupervised access to vulnerable persons.

---

[15] The trial court expressly dismissed Appellants' APA challenge to the validity of the records retention schedule promulgated by the state records committee. They do not appeal this ruling.

Next, the trial court concluded that RCW 74.39A.056, and not the regulations Appellants challenged, precluded them from being employed in the positions they sought. It determined that the records BCCU used to complete its background check "constitute a state registry" within the meaning of that term in RCW 74.39A.056(2). It also decided the statute's employment ban is permanent and not contingent on any records retention schedule.

The trial court further concluded that DSHS's recommendation to the state records committee that its records retention policy for founded child abuse or neglect findings be changed from 6 to 35 years was not a rule subject to the APA rule-making provisions. And it held that the records retention policy violated neither the equal protection clauses nor the privileges and immunities provisions of the federal or state constitutions.

Finally, the trial court decided that DSHS rules treating individuals with pre-October 1998 findings differently than individuals with post-October 1998 findings were neither arbitrary nor capricious because the date was tied to the state's compliance with CAPTA, after which it afforded individuals notice and opportunity to challenge child abuse or neglect findings against them. It dismissed the claims with prejudice.

This appeal followed. Legal Voice filed a separate amicus brief supporting Appellants and raising new issues.[16]

---

[16] While we are grateful for amicus's assistance, we decline to reach the issues that only it raised. See State v. Shale, 182 Wn.2d 882, 886 n.4, 345 P.3d 776 (2015).

II. ANALYSIS

Appellants argue the trial court erred in concluding that RCW 74.39A.056(2) mandates a permanent ban on their employment as long-term care workers. They contend that DSHS has the statutory discretion to set the duration of any employment ban and effectively set the ban at 35 years without going through the APA rule-making process. Appellants also argue the trial court's conclusion that DSHS's FamLink database is a "registry" under RCW 74.39A.056 is not supported by substantial evidence. They next argue that DSHS's regulations, enforcing the employment ban in RCW 74.39A.056 only against persons with post-October 1, 1998 abuse or neglect findings, have no basis in the text of that statute or any other law, and the decision not to afford Appellants an individualized assessment of their character, competence, and suitability to work as long-term care workers is unconstitutional. Finally, they assert the trial court erred in dismissing their claim for relief under 42 U.S.C. § 1983.

A. Standards of Review

We review the trial court's interpretation of RCW 74.39A.056(2) de novo. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). Our review of the validity of DSHS rules is governed by the APA standard set out in RCW 34.05.570(2).[17] We review Appellants' allegation that DSHS failed to follow the rule-making procedures of the APA under RCW 34.05.570(4).[18] Rios v.

---

[17] "In a proceeding involving review of a rule, the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious." RCW 34.05.570(2)(c).

[18] The trial court appears to have determined that RCW 34.05.570(2) governed this claim, rejecting DSHS's argument that Appellants' claim was an untimely challenge to the agency's failure

- 21 -

Dep't of Labor & Indus., 145 Wn.2d 483, 491-92, 39 P.3d 961 (2002). The standard applicable to an agency's alleged "failure to perform" is similar to the standard of review governing the challenge to that agency's rules. Id. at 492; compare RCW 34.05.570(4)(c), with RCW 34.05.570(2)(c). Accordingly, we may grant relief if we determine that an agency action is unconstitutional, outside the agency's statutory authority, or arbitrary or capricious. Rios, 145 Wn.2d at 492. The APA places "[t]he burden of demonstrating the invalidity of agency action . . . on the party asserting invalidity." RCW 34.05.570(1)(a); see also Rios, 145 Wn.2d at 491.

In an APA declaratory judgment action, judicial review of disputed facts is conducted by the trial court without a jury and is confined to the agency record, unless the court authorizes the parties to supplement the record with additional evidence. RCW 34.05.558. If, after a bench trial, the trial court issues findings of fact and conclusions of law, ordinary rules of appellate procedure apply. See Simpson Tacoma Kraft Co. v. Dep't of Ecology, 119 Wn.2d 640, 646, 835 P.2d 1030 (1992); Nollette v. Christianson, 115 Wn.2d 594, 599, 800 P.2d 359 (1990). This court reviews the trial court's findings and conclusions as it would do in any other declaratory judgment action—the trial court findings of fact supported by substantial evidence will not be disturbed on appeal, and conclusions of law are reviewed de novo. Nollette, 115 Wn.2d at 599-600.

---

to promulgate a rule under RCW 34.05.570(4). Although we believe the trial court erred in applying RCW 34.05.570(2) to Appellants' APA rule-making procedures claim, the error was harmless because ultimately the standard of review under both statutory provisions is similar.

As to the summary judgment dismissal of their § 1983 claim, an appellate court engages in the same inquiry as the trial court. New Cingular Wireless PCS, LLC v. City of Clyde Hill, 187 Wn. App. 210, 215, 349 P.3d 53 (2015), aff'd, 185 Wn.2d 594, 374 P.3d 151 (2016). Thus, we review the dismissal of Appellants' § 1983 claim de novo. Robinson v. City of Seattle, 119 Wn.2d 34, 57, 830 P.2d 318 (1992).

B. Statutory Bar to Employment as Long-Term Care Workers

The main issue on appeal is whether the trial court erred in concluding that RCW 74.39A.056(2) mandates a permanent ban on Appellants' employment as long-term care workers.

The court's fundamental objective in determining the meaning of a statute is to ascertain and carry out the legislature's intent. Dep't of Ecology, 146 Wn.2d at 9. When possible, the court derives legislative intent from the plain language of the statute, considering the text in question, the context in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. Id. at 10-11. We give words their usual and ordinary meaning. Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010). And while it is not always necessary to strictly adhere to technical grammatical rules in interpreting statutory provisions, Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles, 148 Wn.2d 224, 242, 59 P.3d 655 (2002), we give weight to these rules and try to construe language in accordance with those rules, rather than contrary to them, Duke v. Johnson, 123 Wash. 43, 49, 211 P. 710 (1923). We also presume the legislature does not intend

absurd results, and we avoid any reading that produces such a result. Tingey v. Haisch, 159 Wn.2d 652, 664, 152 P.3d 1020 (2007).

Appellants start from the premise that RCW 74.39A.056(2) prohibits their employment only if their names appear in "a state registry." We disagree with this reading as inconsistent with the text. Because the grammar of RCW 74.39A.056(2) is somewhat complex, the statute makes sense only if we deconstruct its provisions in the following manner:

Clause #1    No provider, or its staff, or long-term care worker, or prospective provider or long-term care worker,

Clause #2        with a stipulated finding of fact, conclusion of law, an agreed order, or finding of fact, conclusion of law, or final order issued by a disciplining authority or a court of law

Clause #3        or entered into a state registry

Clause #4    with a final substantiated finding of abuse, neglect, exploitation, or abandonment of a minor or a vulnerable adult as defined in chapter 74.34 RCW

Clause #5    shall be employed in the care of and have unsupervised access to vulnerable adults.

The word "or" before the phrase "entered into a state registry" is significant. The word "or" is most commonly used in the disjunctive and employed to indicate an alternative. Black v. Nat'l Merit Ins. Co., 154 Wn. App. 674, 688, 226 P.3d 175 (2010). Following this basic grammatical rule, the most reasonable interpretation is that RCW 74.39A.056(2) prohibits employment as a long-term care worker in two distinct situations—either when a disciplining authority or court has found that an individual committed child abuse or when DSHS has found that an individual committed child abuse or neglect and entered his or her name into a state registry.

- 24 -

Following these rules of statutory construction, we must reject Appellants' premise that only individuals who appear in "a state registry" are barred from employment as long-term care workers to vulnerable adults.

This statutory construction undermines Appellants' contention that RCW 74.39A.056(2) gives DSHS the discretion to decide who will be disqualified from work as long-term care workers by deciding how long to retain records of child abuse findings. If a court, rather than DSHS, has found that a person has committed child abuse, DSHS does not have the discretion to allow that person to work with vulnerable adults, even if DSHS could delete the person's name from its records. The court's finding will remain in court records independent of any database DSHS may maintain. And if RCW 74.39A.056(2) imposes a permanent ban on employment for individuals found by a court to have committed child abuse, it makes no sense to conclude the statute does not require the same result for individuals found by DSHS to have done so.

Next, Appellants argue that the phrase "entered into a state registry" is ambiguous because there is no "central registry" for child abuse findings. In interpreting statutes, we refer to dictionaries to determine the plain meaning of an undefined statutory term. Nissen v. Pierce County, 183 Wn.2d 863, 881, 357 P.3d 45 (2015). "Enter" means to "make a record of" or "to put on record." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 756 (2002); see also Enter, Black's Law Dictionary 672 (11th ed. 2019) ("[t]o put formally before a court or on the record"). A "registry" is the place where a "register" is kept. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1912 (2002). And a "register" is "a written record

containing regular entries of items or details: an official or formal enumeration, description, or record of particulars." Id.; see also Register, Black's Law Dictionary 1535-36 (11th ed. 2019). Based on these definitions, the phrase "entered into a state registry" in the statute is unambiguous: it is the governmental act of making an official written record of the names of individuals found by DSHS to have engaged in child abuse or neglect.

Appellants argue that DSHS cannot ban their employment as long-term care workers because DSHS admits that it does not maintain a "central registry" of child abuse perpetrators. We do not find this argument persuasive. First, the statute references a "state registry," not a "central registry." Thus, no central registry is required. Second, the legislature understood that DSHS compiles information from child abuse investigations because, in 2012, when it added RCW 26.44.020(17)(b) to the child abuse statute, it explicitly referred to the agency's "child abuse or neglect database." See LAWS OF 2012, ch. 259, § 3(17)(b). A database is a "comprehensive collection of related data organized for convenient access, generally in a computer." WEBSTER'S UNABRIDGED DICTIONARY 508 (2d ed. 2001); see also Database, Black's Law Dictionary 495 (11th ed. 2019) ("[a] compilation of information arranged in a systematic way"). We see no distinction between "a state registry" of individuals found to have committed child abuse and a state-created and maintained "database" containing the same information.

Furthermore, the trial court concluded that "the records used by the BCCU constitute a state registry as that term is used in RCW 74.39A.056(2)." What constitutes a "state registry" is a mixed question of law and fact. See Henry Indus.,

Inc. v. Dep't of Labor & Indus., 195 Wn. App. 593, 601, 381 P.3d 172 (2016) (whether drivers meet statutory definition of "worker" under Industrial Insurance Act is a mixed question of law and fact). The court engages in a de novo review of mixed questions of law and fact, applying facts as determined by the trier of fact. See Franklin County Sheriff's Office v. Sellers, 97 Wn.2d 317, 330, 646 P.2d 113 (1982). Because Appellants did not assign error to any of the trial court's findings of fact, we accept them as true on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

The trial court found that BCCU received information from DSHS about Appellants' founded child abuse findings while conducting background checks. BCCU uploaded this information from the FamLink database into its own database. The trial court also found that Appellants were required by law "to attest under penalty of perjury as to whether they have any prior founded findings of child abuse or neglect." Importantly, RCW 43.43.834(2)(b) mandates such disclosures. BCCU staff entered this self-disclosed information into its database. Finally, BCCU conducted a search of court records and Department of Health records to look for final court findings or disciplinary findings of child abuse or neglect. BCCU entered this information, if it existed, into its database as well. BCCU's repository of background information is a state-created and maintained database. Thus, we conclude there is substantial evidence in the record to support the trial court's conclusion that BCCU's database constitutes "a state registry" under RCW 74.39A.056(2).

Appellants next argue that if DSHS chose to delete a person's founded finding from FamLink and BCCU's database, the finding would no longer be "entered into a state registry" and could not disqualify that person from long-term care work. They contend that RCW 43.43.832(2) gives DSHS the discretion to determine who should be deleted from any child abuse "state registry" and that RCW 26.44.031 gives DSHS the discretion to determine how long a person will remain listed. They read these three statutes together to mean that DSHS has the legal authority to set—by rule—the duration of RCW 74.39A.056(2)'s employment ban.

There are several problems with this argument. First, the phrase "entered into a state registry" does not modify "with a final substantiated finding of abuse"; it modifies "prospective provider or long-term care worker." Under the last antecedent rule, qualifying or modifying words or phrases refer to the last antecedent. State v. Bunker, 169 Wn.2d 571, 578, 238 P.3d 487 (2010). The registry is thus a database of names, not the underlying investigative materials. DSHS's records retention policy addresses only the retention of child abuse case files; it does not mandate the deletion of the names of individuals found to have committed child abuse. According to DSHS's records officer, DSHS has never deleted any individual's name from its database since implementing FamLink. And the record contains no evidence that BCCU has ever deleted this information either.[19]

---

[19] The evidence also indicates that DSHS treats the records retention policy as setting the minimum, rather than maximum, period of time it retains the founded case file materials. According

Second, destroying records at the end of a pre-set retention period is not synonymous with vacating or "expunging" a founded finding of child abuse, as Appellants suggest. The former is merely the administrative act of physically destroying a document, whereas the latter constitutes the legal process of nullifying or voiding a finding, as if it had never occurred. We can find nothing in RCW 74.39A.056(2), or the background check statute, RCW 43.43.832(2), or the records retention statute, RCW 26.44.031, to indicate a legislative intent to grant to DSHS the authority to vacate or expunge a final substantiated finding of child abuse.

Appellants cite Howell v. Department of Social & Health Services, 7 Wn. App. 2d 899, 436 P.3d 368 (2019), to support their argument that RCW 74.39A.056 is not a categorical employment bar. But Howell involved different legal claims and a different procedural posture. In that case, a certified nursing assistant (CNA) student alleged that DSHS's rules and policies of retaining records of founded child abuse findings violated Washington's Law Against Discrimination (WLAD) because those rules and policies disparately impact Native Americans like herself who seek work as a CNA. Id. at 902. Division Three of this court reversed a CR 12(c) dismissal of her claim, holding that Howell pleaded a prima facie case of disparate impact discrimination. Id. at 907, 910, 921.

The court rejected DSHS's argument that RCW 74.39A.056 barred Howell's WLAD claim. Id. at 917. In doing so, the court noted that DSHS has the authority,

---

to the statewide administrator for the Division of License Resources within Children's Administration, DSHS is not required to destroy any documents at the end of a retention period.

under RCW 74.39A.056(3), to establish a state registry, and the authority, under RCW 74.39A.056(4), to fashion background check requirements permitting people to expunge child abuse findings after demonstrating their rehabilitation or to reduce the record retention period on a background check when lacking evidence of future harm to children. Id. at 916. We note, however, that RCW 74.39A.056(3) does not apply to child abuse findings. That provision relates only to the state registry for individuals found to have abused vulnerable adults, not children. To the extent Division Three held in Howell that RCW 74.39A.056(3) relates to a state registry of individuals with founded child abuse findings, we disagree.

Moreover, Division Three alternatively held that RCW 74.39A.056 did not present a complete bar to Howell's employment as a nursing assistant because the statute, by its terms, only applies to "long-term care workers" with unsupervised access to vulnerable adults and "[n]ot all [CNA] employment would require Ms. Howell to provide care, with unsupervised access, to vulnerable adults." Id. at 917-18. It thus rejected DSHS's argument that RCW 74.39A.056(2) prevented it from employing Howell as a nursing assistant. But because none of the Appellants sought work as certified nursing assistants, this holding from Howell is unhelpful.

Finally, Howell did not challenge RCW 74.39A.056's employment ban. Id. at 907. Instead, she challenged DSHS's dissemination of child abuse findings without a method to avoid racial disparity. Id. Appellants, unlike Howell, have not alleged they are the victims of disparate impact discrimination in violation of the WLAD. Moreover, Howell came to the court on review of a CR 12(c) motion to dismiss, not the post-trial dismissal of a petition for declaratory relief under the

APA. For these reasons, we conclude <u>Howell</u> is legally and factually distinguishable.

While we agree with Appellants that the employment ban in RCW 74.39A.056(2) is harsh and that there are legitimate policy reasons for the legislature to reconsider whether such a ban should be permanent, we cannot rewrite or modify the language of a statute under the guise of statutory interpretation or construction. <u>Graham Thrift Group, Inc. v. Pierce County</u>, 75 Wn. App. 263, 267, 877 P.2d 228 (1994). We must give full effect to the plain language of the statute, even when the results may seem unduly harsh. <u>Geschwind v. Flanagan</u>, 121 Wn.2d 833, 841, 854 P.2d 1061 (1993).

We conclude that because Appellants' names have been entered into BCCU's database because of final substantiated findings of child abuse, RCW 74.39A.056(2) prohibits them from being employed to care for vulnerable adults.[20]

C. <u>Validity of DSHS Pre-CAPTA and Post-CAPTA Regulations</u>

Next, Appellants argue that DSHS regulations granting individualized suitability reviews to people with pre-October 1, 1998 findings, but denying them to people found to have committed child abuse after October 1, 1998, have no basis in the text of RCW 74.39A.056 and are arbitrary and capricious. We disagree because abuse findings made prior to October 1, 1998 are not "final" findings, and the automatic employment ban does not apply.

---

[20] DSHS's recommended extension of its records retention policy, whether promulgated by rule or approved by the state records committee, would not change this outcome. We therefore decline to reach the claim that DSHS violated the APA by recommending a change to this policy.

RCW 74.39A.056(2) applies only to "final substantiated" findings of abuse. According to Dee Wilson,[21] Appellants' child welfare expert, a "founded" finding of child abuse is the same as a "substantiated" finding. A founded finding becomes "final" either when an alleged perpetrator fails to exercise the right to challenge the finding or after a court or administrative law judge upholds the agency finding. RCW 43.43.830(4); WAC 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. Only individuals named as alleged perpetrators of child abuse and neglect after October 1, 1998 have the right to seek review of a founded finding. RCW 26.44.125. When these statutes are read in context with one another, the statutory employment ban cannot by its own terms apply to individuals with findings of abuse pre-dating October 1, 1998.

Because DSHS does not consider pre-CAPTA findings of child abuse to be substantiated or final under RCW 74.39A.056(2), DSHS allows anyone with such a finding to be considered for employment with vulnerable adults—but only after they undergo a character, competence, and suitability review. These reviews thus serve the function for pre-CAPTA findings that the administrative and judicial reviews serve for post-CAPTA findings. Furthermore, the legislature granted DSHS the discretion to set rules for considering such findings in RCW 43.43.832(2). Thus, the regulations treating individuals with pre-CAPTA and post-CAPTA findings of abuse differently are clearly statutorily authorized.

---

[21] The trial court considered Wilson's declaration in making its findings of fact and conclusions of law, despite DSHS's objection. While DSHS references the trial court's consideration of the declaration, DSHS does not challenge it. As we are not considering Wilson's declaration for information directly relevant to any of the issues on appeal, we see no harm to DSHS in considering the declaration for this small point of clarification.

Nor can we conclude the regulations are arbitrary or capricious. A regulation is arbitrary and capricious only if it is willful, unreasoning, and taken without regard to the attending facts or circumstances. Ass'n of Wash. Spirits & Wine Distribs. v. Wash. State Liquor Control Bd., 182 Wn.2d 342, 358, 340 P.3d 849 (2015). Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous. Id. The scope of review under the arbitrary and capricious standard is very narrow, and the party asserting it carries a heavy burden. Pierce County Sheriff v. Civil Serv. Comm'n of Pierce County, 98 Wn.2d 690, 695, 658 P.2d 648 (1983).

DSHS's reason for allowing character reviews for individuals with pre-CAPTA findings and disallowing similar reviews for Appellants is not unreasoning or taken without regard to the facts and circumstances. DSHS has provided a previously lacking legal mechanism to challenge the factual basis for CPS findings. In doing so, DSHS avoids due process concerns that arise from any CPS finding that could result in the denial of employment. See Fields v. Dep't of Early Learning, 193 Wn.2d 36, 50-52, 434 P.3d 999 (2019) (due process violation to disqualify employee from working in licensed childcare facility without individualized suitability review when department regulation made prior robbery conviction automatically disqualifying fact and employee precluded from challenging regulation at administrative level).

Under the post-CAPTA regulatory framework, any person named as an alleged perpetrator in a founded CPS report may challenge that finding. WAC 110-

30-0220. Garcia exercised her right to raise such a challenge, and the ALJ affirmed the founded finding after an evidentiary hearing. Semenenko similarly sought to challenge the adverse finding, but this court held her appeal was untimely. Appellants availed themselves of the review mechanisms available for post-CAPTA findings. The DSHS regulations take into consideration both the due process concerns of the pre-CAPTA period and the mandatory language of the employment ban in RCW 74.39A.056(2) for individuals with a post-CAPTA final finding of abuse. The regulations thus are neither arbitrary nor capricious.

D. Constitutional Challenge to DSHS Regulations

Appellants next argue DSHS's rules limiting suitability reviews to individuals with pre-October 1998 abuse findings deny them equal protection under the law required by the Fourteenth Amendment and the privileges and immunities clause of article I, section 12 of the Washington Constitution.[22] These provisions require that all persons similarly situated be treated alike. Am. Legion Post No. 149 v. Dep't of Health, 164 Wn.2d 570, 608, 192 P.3d 306 (2008). Appellants argue that DSHS regulations classify individuals found to have committed child abuse after October 1, 1998 differently than those found to have done so before that date, without any rational justification for doing so.

The appropriate level of scrutiny under an equal protection challenge depends on the nature of the classification or rights involved. Id. In Amunrud v. Board of Appeals, 158 Wn.2d 208, 220-21, 143 P.3d 571 (2006), our Supreme

---

[22] The right to equal protection guaranteed under the Fourteenth Amendment and by the privileges and immunities clause of the Washington Constitution are substantially identical and considered as one issue. State v. Smith, 117 Wn.2d 263, 281, 814 P.2d 652 (1991).

Court acknowledged that rational basis review is the appropriate standard for evaluating regulations affecting one's ability to work either in a governmental position or in an occupation of one's choosing. See also Mass. Bd. of Ret. v. Murgia, 427 U.S. 307, 313-14, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976) (no fundamental right to government employment); Nebbia v. New York, 291 U.S. 502, 527-28, 54 S. Ct. 505, 78 L. Ed. 940 (1934) (the right to work in a particular profession or trade subject to rational regulation).

We apply a three step process under the rational basis test. First, we ask whether the classification applies alike to all members within the designated class. Yakima County Deputy Sheriff's Ass'n v. Bd. of Comm'rs for Yakima County, 92 Wn.2d 831, 835, 601 P.2d 936 (1979). Second, we determine whether there is some basis in reality for reasonably distinguishing between those within and outside the class. Id. Finally, we consider whether the classification has any rational relation to the purposes of the challenged regulations. Id. at 836. Challengers must do more than merely question the wisdom of the regulations; they must show conclusively that the classification is contrary to the legislation's purpose. Id.

First, DSHS regulations do not treat two similarly situated classes of people unequally. While the regulations do not permit Appellants to obtain a suitability review and explicitly allow such reviews for individuals with pre-CAPTA findings, these two classes of individuals seeking jobs with vulnerable adults are not similarly situated because the Appellants' class had an administrative process to challenge their CPS finding as unsubstantiated or false; but those with pre-CAPTA

- 35 -

findings had no such opportunity. Where persons of different classes are treated differently, there is no equal protection violation. Forbes v. City of Seattle, 113 Wn.2d 929, 943, 785 P.2d 431 (1990).

Second, there is a basis in reality for distinguishing between Appellants and individuals with pre-CAPTA abuse findings. A classification does not violate equal protection if it is not arbitrary or capricious. Id. at 944. As indicated above, drawing a distinction between these two groups is not arbitrary or capricious in light of the change in the law after Congress passed CAPTA.

Finally, DSHS's decision to grant a suitability review to individuals with pre-CAPTA findings but to deny them to Appellants has a rational relation to the purpose of the challenged regulations. As DSHS notes, the regulations give meaning to the term "final" in RCW 74.39A.056(2). Because individuals who were the subject of a CPS investigation before CAPTA had no notice or opportunity to challenge an abuse finding, that finding did not legally become "final," and they are not subject to the automatic employment ban.[23]

Appellants rely on Fields v. Department of Early Learning to support their request for an individualized assessment of their suitability to work with vulnerable adults. In that case, the employee of a licensed childcare facility appealed a decision of the Department of Early Learning (DEL), which disqualified her to work at the facility based on a prior attempted robbery conviction. 193 Wn.2d at 38-39.

---

[23] We decline to address Appellants' contention that DSHS's recommendation to the state records committee for a 35-year records retention policy violates equal protection or the privileges and immunities clause of article I, section 12. Because we conclude that the statutory provision, and not the records retention policy, imposes the employment ban, we need not reach this issue.

Fields contended a DEL regulation that precluded anyone with a robbery conviction from having unsupervised access to children violated her right to due process. Id. at 40-41.

As the Supreme Court noted, DEL is required to run background checks on anyone who wants to work in a childcare facility. Id. at 43. Furthermore, the statute at issue in Fields, former RCW 43.215.215(1), required DEL to determine whether any individual seeking such employment "is of appropriate character, suitability, and competence to provide child care and early learning services to children." Id. DEL promulgated a regulation providing that any individual with a listed conviction[24] was "permanently disqualified from providing licensed child care, caring for children or having unsupervised access to children in child care." Id. (quoting former WAC 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(1), recodified as WAC 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). It also promulgated a regulation that prohibited a person with a disqualifying conviction from challenging this regulation at the administrative level. Id.

In analyzing Fields' procedural due process challenge, the Supreme Court held that the DEL regulation, as applied to Fields, created an unusually high risk of arbitrary interference by the State and, as a result, an erroneous deprivation of the right to pursue a lawful career of her choice. Id. at 51. It held that Fields was entitled to an individualized assessment of her criminal history and other qualifications at the administrative level. Id. at 52.

---

[24] The list includes 50 types of permanently disqualifying convictions. Id. at 43; see also former WAC 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, recodified as WAC 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.

Appellants have raised neither a substantive nor a procedural due process challenge to the employment ban in RCW 74.39A.056(2) or to the challenged regulations. And the statute at issue in Fields differs significantly from RCW 74.39A.056(2). Former RCW 43.215.215, recodified as RCW 43.216.270(1), provides:

> In determining whether an individual is of appropriate character, suitability, and competence to provide child care and early learning services to children, the department[25] may consider the history of past involvement of child protective services or law enforcement agencies with the individual for the purpose of establishing a pattern of conduct, behavior, or inaction with regard to the health, safety, or welfare of a child. No report of child abuse or neglect that has been destroyed or expunged under RCW 26.44.031 may be used for such purposes. No unfounded or inconclusive allegation of child abuse or neglect as defined in RCW 26.44.020 may be disclosed to a provider licensed under this chapter.

The statute differs from RCW 74.39A.056(2) in that (a) it gives the department the discretion to assess the character, suitability, and competence of anyone seeking a childcare position before disqualifying them from that work; and (b) it specifically precludes the department from considering child abuse reports that have been destroyed or expunged under RCW 26.44.031. Because there are such significant differences between RCW 74.39A.056(2) and RCW 43.216.270(1), the holding in Fields does not apply in this case.

---

[25] Effective July 1, 2018, DEL became a part of DCYF. Fields, 193 Wn.2d at 42. The reference to "the department" in the statute referred to DEL at the time of Fields' disqualification but now refers to DCYF.

- 38 -

E. Dismissal of 42 U.S.C. § 1983 Claim on Summary Judgment

Finally, Appellants ask this court to reverse the dismissal of their claim for injunctive relief under 42 U.S.C. § 1983. Their claim under this statute was based on the assertion that the Secretary of DSHS violated their right "to equal protection of the law by creating an irrational classification that denies [them] the ability to work in a field of their choosing." Because Appellants have not demonstrated that DSHS created an irrational classification in its regulations, and because it was the legislature, and not DSHS, that denied Appellants the opportunity to work as long-term care workers, we affirm the dismissal of their § 1983 claim.

Because we affirm the trial court's dismissal of Appellants' petition, they are not the prevailing party and, as a result, are not entitled to an award of attorney fees on appeal under RCW 4.84.350.

Affirmed.

WE CONCUR:

Andrus, J.